**In re Rebecca Sue MOURER and Ronald Lee Mourer, Debtors.**

**Rebecca Sue Mourer and Ronald Lee Mourer, Plaintiffs,**

**v.**

**Equicredit Corporation of America and Cascade Capital Funding, LLC, Defendants.**

**Bankruptcy No. SG 00–10103.
Adversary No. 01–88196.**

United States Bankruptcy Court,
W.D. Michigan.

Jan. 10, 2003.

John A. Potter, Twohey Maggini, PLC, Grand Rapids, MI, for Debtors.

Brett N. Rodgers, Grand Rapids, MI, Chapter 13 Trustee.

## OPINION AND ORDER REGARDING TRUTH IN LENDING ACT AND HOME OWNERSHIP AND EQUITY PROTECTION ACT

JO ANN C. STEVENSON, Bankruptcy Judge.

This matter comes before the Court on Debtors' Complaint alleging Equicredit Corporation of America (Equicredit) violated the Truth in Lending Act and the Home Ownership and Equity Protection Act by failing to make certain required disclosures in writing and charging the Debtors fees and points which exceeded the maximum allowed under the statute. In addition, Debtors Complaint alleges that their broker, Cascade Capital Funding, LLC violated state law by making representations that were materially false.

The claims presented in this adversary proceeding arise in a case referred to this Court by the Standing Order of Reference entered by the United States District Court for the Western District of Michigan on July 24, 1984. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (O). Accordingly, the Bankruptcy Court is authorized to enter a final judgment subject to the appeal rights afforded by 28 U.S.C. § 158 and Fed. R. Bankr.P. 8001 et. seq.

The following constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052. In reaching its determinations, this Court has considered the demeanor and credibility of all witnesses who testified, the exhibits properly admitted into evidence, and the parties' briefs and closing arguments.

In April of 2000, Rebecca Mourer received a phone call from her mortgage broker, Todd Richards. Richards had recently started working at Cascade Capital Funding LLC (Cascade) and was contacting past customers to see if they were interested in refinancing.

Initially, Richards indicated that the Mourers might be eligible for a 10% mortgage interest rate as opposed to the 12.2% they were paying. In addition, Richards told the Debtors that they would be able to borrow enough money to pay off their car loan and taxes in full.

These inducements were appealing to the Mourers because their car and house payments as well as their taxes were overdue. Therefore, the Mourers authorized Richards to proceed with the refinancing of their house.

The closing was scheduled for Friday, May 5, 2000. The Mourers claim that no one from Cascade or the lender, Equicredit, called with final figures. Cascade claims that the Mourers were contacted well before the closing and told that their interest rate would be higher than the initial estimate of 10% due to a history of late or missed mortgage payments.

At the closing, the Mourers discovered that their house was being refinanced at an interest rate of 13.3729%. Admittedly, they could have refused to close, but felt they had no choice because their house and car payments were already late. When they left the closing, copies of the closing documents were not provided and the Debtors spent months tracking them down.

The amount financed by Equicredit was $58,228.00. From these proceeds the Debtors' previous mortgage was satisfied, their car loan was paid in full, their delin-

quent taxes were brought up to date and they received $5,006.01 in cash.

Shortly after the closing, Mr. Mourer suffered both a disabling disease and a failed business attempt, plunging them into further financial distress. By late 2000, they were finding it increasingly difficult to keep their house payment current. On December 20, 2000, they filed bankruptcy under Chapter 13. Equicredit was listed as a secured creditor with an outstanding debt of $60,000.00. The Debtors submitted a plan which was confirmed on February 28, 2001. In the plan, Equicredit was treated as secured and slated to receive monthly payments of $661.13 commencing February 1, 2001. Allowed arrearages estimated at $2,700.00 were to be paid over a reasonable time with interest. The plan also called for Equicredit to retain its lien on the house.

On April 20, 2001, Equicredit filed a proof of claim for $62,309.51. The Debtors filed an adversary proceeding on May 8, 2001, alleging that the refinancing transaction should be rescinded because Equicredit had failed to make certain disclosures and had charged fees and points in excess of the maximum allowed under the Truth In Lending Act and the Home Ownership and Equity Protection Act (HOEPA).

The points and fees associated with the loan paid by the Debtors included a $3,500.00 broker fee, a processing and underwriting fee of $370.00 and a yield spread premium of $1,248.00. A yield spread premium is a fee paid by the lender, in this case Equicredit, to the mortgage broker, Cascade. The lender recoups this fee by charging the borrower a slightly higher interest rate.

If the yield spread premium is included in the fees paid by the borrower in this case, the parties agree that the fees and costs paid would equal 8.8789% thus triggering Regulation Z, Article 32 of HOEPA

and the Truth In Lending Act; if not included, the fees and costs would equal only 6.646%.

The Truth in Lending Act, (TILA) 15 U.S.C. § 1601–1666i, "reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.'" *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). Compliance with the Act requires a lender to provide specific information in certain types of consumer credit transactions in order to allow a borrower to make an informed and educated decision about the costs and terms of the bargain. TILA applies to consumer credit transactions involving the extension of credit to an individual for personal, family or household purposes. 15 U.S.C. § 1602(e).

Consumer lending transactions under TILA are divided into "open end credit plans" under 15 U.S.C. § 1602(i) and "closed end credit." Reg. Z, 12 C.F.R. § 226.2(a)(10). Closed end transactions are one time credit loans and many consumer loans such as car or home loans.

Chapter 2 of TILA focuses on consumer credit transactions and contains civil liability provisions, See 15 U.S.C. §§ 1635 and 1640, that allow consumers to recover damages against creditors who do not comply with TILA's requirements. The Act is implemented by Regulation Z. Whether Regulation Z is applicable is determined by the occurrence of certain triggers in specific consumer credit activities.

■ 12 C.F.R. § 226.32(a)(1) of Regulation Z, applies to consumer credit transactions secured by the consumer's principal dwelling, and in which either:

(i) The annual percentage rate at consummation will exceed by more than 8 percentage points for the first-lien loans,

or by more that 10 percentage points for subordinate-lien loans ... [or]

(ii) The total points and fees payable by the consumer at or before loan closing will exceed the greater of 8 percent of the total loan amount, or $400 ...

This is qualified by 12 C.F.R. § 226.32(b) which states:

(b) For purposes of this subpart, the following definitions apply:

(1) For purposes of paragraph (a)(1)(ii) of this section, *points and fees* means;

(i) All items required to be disclosed under § 226.4(a) and 226.4(b), except interest or the time-price differential;

(ii) All compensation paid to mortgage brokers;

Here, the seminal issue is whether the yield spread premium paid by Equicredit to Cascade but ultimately collected from the Debtors in the form of a higher interest rate should be included in calculating whether the points and fees exceed 8% of the total loan amount thereby activating HOEPA, 15 U.S.C. § 1602, Article 32 of Regulation Z.

Equicredit argues that the yield spread premium should not be included in the calculation of points and fees because it was not paid "by the consumer at or before closing." The Debtors argue that the yield spread premium is a form of finance charge, paid to the broker as compensation at the time of closing through an increased interest rate over the term of the loan and should be included in the calculation.

■ "TILA is a remedial statute and should be construed liberally in favor of the consumer." *Pfennig v. Household Credit Services*, 286 F.3d 340, 344 (6th Cir.2002) quoting *Jones v. TransOhio Savings Association*, 747 F.2d 1037, 1040 (6th Cir.1984). This is especially challenging when "the statute is hardly a model of clear drafting." Peter Fesseden, *Consumer Credit Protection Violations, A Primer* in Norton Bankruptcy Law Adviser, 10 (William L. Norton ed., October 2002).

12 C.F.R. § 226.4(a) defines a finance charge as including:

[A]ny charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit.

It also delineates a special rule regarding mortgage broker fees stating:

(3) Fees charged by a mortgage broker (including fees paid by the consumer directly to the broker or to the creditor for delivery to the broker) are finance charges even if the creditor does not require the consumer to use a mortgage broker and even if the creditor does not retain any portion of the charge.

Comment 4(a)(3)–3 to Regulation Z as adopted on March 6, 1997, addresses the treatment of compensation paid by the creditor to a mortgage broker. It states:

The rule requires all mortgage broker fees to be included in the finance charge. Creditors may draw on amounts paid by the consumer, such as points or closing costs, to fund their payment to the broker. Compensation paid by a creditor to a mortgage broker under an agreement is not included as a separate component of a consumer's total finance charge (although this compensation may be reflected in the finance charge if it comes from amounts paid by the consumer to the creditor that are finance charges such as points and interest.)

■ By using such encompassing terms as "all" or "any" and "directly or indirectly" several times with relative consistency when referring to fees paid to mortgage brokers and charges paid by consumers, we interpret the statute to mean that all

fees to the broker are considered finance charges regardless of the direct source. Comment 4(a)(3)–3 supports this conclusion.

■ Comment 4(a)(3)–3 simply clarifies the permissible source of compensation to the broker. The first sentence of the Comment unambiguously states: "The rule requires *all mortgage broker fees* to be included in the finance charge." (Emphasis added). Sometimes a lender negotiates a separate agreement with a broker to pay for services rendered. When this occurs, the lender is allowed, if it so chooses, to pay the broker from the closing costs. However, any compensation under this agreement between the broker and the lender is not to be listed as a separate component of the finance charge *unless* it comes from the consumer, in the form of points or interest. Then it *may* be reflected in the finance charge.

In this case, the yield spread premium is being paid by the consumer in the form of a higher interest rate. Interest is not an item that is paid up front, out of pocket at closing, but throughout the life of the loan. Consequently, Equicredit argues that because it is not mandatory that this fee be disclosed as a finance charge it should not be included in its calculation.

However, we find that by virtue of the definition of a finance charge found in § 226.4(a) and consistent with the special rule regarding mortgage broker fees in § 226.4(a)(3), the yield spread premium would be a finance charge indirectly paid by the consumer incident to the extension of credit.

We come to this conclusion primarily by looking to the spirit of the law. "Not the letter, but the spirit: for the letter killeth, but the spirit giveth life." *The Second Epistle of Paul the Apostle to the Corinthians* 3:6.

The purpose of TILA is to promote the informed use of credit by requiring creditors to make uniform disclosures in order for consumers to compare various credit terms. Equicredit paid Cascade $1,248.00 in fees. According to testimony, for Equicredit to recover this fee, the Mourers were charged an extra 1.1% in interest over the life of the 30 year loan. (Transcript, September 24, 2002 at 146). Without the increase, the Mourers monthly payment would be $53.33 less per month which over the course of a 30 year loan translates to $17,974.80. Certainly, given the choice, the Mourers would have preferred to pay $1,248.00 up front, out-of-pocket in order to save $16,726.80.

But under TILA and Regulation Z, the broker is prohibited from receiving this much compensation from the consumer as a finance charge. Using Equicredit's argument, the Mourers had no choice but to pay a broker fee 14 times more than they would have had to pay had TILA never been enacted in order to keep Equicredit from violating Article 32.

The usurious return to the lender in the form of ambiguous charges to the consumer is the kind of transaction that is anathema to TILA and exactly what its enactment was meant to discourage.

The Debtors were also entitled to receive certain disclosures under 15 U.S.C. § 1639(b)(1) which they claim were not given. Cascade denies this, saying that Mrs. Mourer was contacted with the new interest rate and other pertinent information well before closing. Cascade produced phone records showing calls made to the Mourers on May 3, 2000. Mrs. Mourer remembers nothing of these calls. Cascade also provided proof that the Mourers requested life insurance on the mortgage for which paperwork was prepared prior to closing and signed at closing.

Due to the evidence submitted at trial, we find that the appropriate disclosures were made by Cascade prior to closing. However, the Debtors also testified that they received no written documents upon leaving the closing. Under 12 C.F.R. § 226.17(a)(1): "The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep."

Mrs. Mourer testified that she called Monday, May 8, 2000, three days after closing to request the documents and received little response. She testified that she had to pursue Cascade every week for months and only after threatening legal action did she receive the closing documents. In the meantime she had to call to determine how much the monthly payments were and where to send them. Equicredit and Cascade did not dispute this testimony.

We find that failure to provide the Mourers the disclosures in a form they could keep expressly violates 12 C.F.R. § 226.17 and 15 U.S.C. § 1639.

■ Lastly, are the allegations that Cascade violated state law by making materially false statements. Debtors argued in their complaint that Todd Richards promised them a 10% interest rate in his initial call regarding the refinancing of the house when in actuality the refinanced rate was over 13%.

At trial Mrs. Mourer admitted that she realized Richards was guessing and that his statement was not a promise but an estimate. (Transcript, September 24, 2002 at 44). Consequently, we find little credence in this claim.

12 C.F.R. § 226.23(3) states in pertinent part:

The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all the consumer's interest in the property, whichever occurs first.

■ Consummation is defined as the time "the consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). Because the Mourers were contractually obligated at the time they left the closing and they did not receive the material disclosures within three days from that date, their right to rescind under TILA has been extended to three years.

■ The repercussions of rescission in bankruptcy cannot be underestimated. A valid rescission would void the security interest and eliminate the Mourer's obligation to pay finance or other charges. Equicredit would become an unsecured creditor with no interest in the collateral. While the Mourers would be required to tender the return of the funds loaned, most bankruptcy decisions have held that this requirement is satisfied by granting the lender an unsecured claim in the bankruptcy. *Williams v. Gelt Financial Corp. (In re Williams)*, 232 B.R. 629 (Bankr. E.D.Pa.1999); *Hill v. Allright Mortgage Co. (In re Hill)*, 213 B.R. 934 (Bankr.Md. 1996), *aff'd* 213 B.R. 943 (D.Md.1997).

Before we analyze whether the transaction between the Mourers and Equicredit should be undone, it is of the utmost importance that we closely examine the intertwining effect of a Chapter 13 filing and the remedies available under TILA within the context now before us.

■ A decision to file Chapter 13 is solely that of a debtor. Creditors can not

file an involuntary petition in Chapter 13. See 11 U.S.C. § 303(a). But when debtors choose to file for relief under Chapter 13, their rights and obligations are determined by the statutory specifications of that chapter.

One requirement of Chapter 13 is that a debtor classify claims. See 11 U.S.C. § 1322(b). The Mourers specifically incorporated their schedules into the plan by reference. In the schedules they valued Equicredit's collateral at $60,000.00. They also separately and distinctly classified Equicredit as a secured creditor stating that it shall retain its lien. The plan called for payments of $661.13 throughout its term.

■ Estoppel by plan confirmation usually occurs in the context of creditors being denied a challenge to payments provided for under a confirmed plan and the valuation of collateral fixed by those plans. *In the Matter of Chappell*, 984 F.2d 775 (7th Cir.1993). *Adair v. Sherman (In re Adair)*, 230 F.3d 890 (7th Cir.2000), found that the plan confirmation order has preclusive effect on all issues raised or which could have been raised prior to confirmation. This applies not only to cases where the creditor's claim was filed pre-confirmation, but was also extended to situations where the debtor's plan itself sets forth collateral value. *In re Hudson*, 260 B.R. 421 (Bankr.W.D.Mich.2001).

Here the plan, by incorporating the schedules, set forth the value of the collateral even though Equicredit's claim was not filed until after the confirmation hearing. Because the Debtors valued and classified Equicredit's claim themselves and had every opportunity to amend their own plan, equity demands that they should be precluded from challenging that claim after confirmation. See *In re Adams*, 270 B.R. 263 (Bankr.N.D.Ill.2001). Furthermore, this cause of action was not listed on the Debtors' schedules as an asset. Because Debtors drafted the plan, it should be construed against them.

There are many cases where a creditor has attempted to collaterally attack a confirmed plan because of its treatment within the plan. More unusual is the situation of this case, where the debtor is collaterally attacking its own plan and the treatment they have provided for the secured creditor. Most often this situation arises when the debtor surrenders collateral and then seeks to have the creditor's deficiency claim reclassified as unsecured. Under these conditions, the courts have generally ruled that a confirmed Chapter 13 plan is binding on both the creditor and debtor absent unanticipated changed circumstances. See *Chrysler Financial Corp. v. Nolan*, 232 F.3d 528 (6th Cir.2000); *In re Goos*, 253 B.R. 416 (Bankr.W.D.Mich. 2000); *In re Algee*, 142 B.R. 576 (Bankr. D.C.1992). This however, is not the situation here.

In this case there were no changed circumstances, no surrender of collateral, no increased or decreased valuation of collateral, the Debtors simply realized they could have proposed a plan providing for treatment of the Equicredit debt as unsecured.

This is not the type of changed circumstance that warrants abandonment of principles that would place every confirmation order at the whim of any creditor or debtor who wanted to litigate an issue that previously had not been raised but could have been raised on or before confirmation.

■ Equicredit's treatment under the confirmed plan was established without vagary. Equicredit was entitled to receive the stated amount plus arrearages with interest on its secured claim. As a result of confirmation, Equicredit could not de-

mand a greater payment on its secured claim, just as the Debtors could not demand to pay any less. An order confirming a Chapter 13 plan is a final order and the terms of the plan are not generally subject to collateral attack.

This is not to be confused with the rulings that the preclusive effect of plan confirmation only applies to issues that are properly raised as contested matters, not those that must be raised in an adversary proceeding. The adversary proceeding in this case was properly filed. However, the remedy of rescission requested by the Debtors and allowed by TILA is contrary to the finality afforded a confirmed plan under Chapter 13. Accordingly, although the Debtors may be entitled to rescission under TILA, the imposition of the bankruptcy filing and the finality of plan confirmation makes this remedy antithetical. The Debtors knew or should have known that their treatment of Equicredit's claim as secured was going to be under attack prior to plan confirmation and should have affirmatively acted to change Equicredit's treatment under the plan.[1]

Of greater importance is that the Debtors request for rescission of the refinancing transaction raises serious concerns that debtors in general will deliberately fail to amend their plans or in cases where proofs of claim are filed prior to confirmation, fail to object to those claims, despite having knowledge and in the hope of maintaining collateral challenges pursuant to statutes like TILA which may provide for additional damages. If debtors were permitted to make such strategic decisions, the concept of finality in bankruptcy would be undermined.

15 U.S.C. § 1640 states in pertinent part:

[A]ny creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title . . . with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of the failure;

\*    \*    \*    \*    \*    \*

(2)(A)(iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2000;

\*    \*    \*    \*    \*    \*

(4) in the case of a failure to comply with any requirement under section 1639 of this title, an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material.

 Accordingly, under 15 U.S.C. § 1640(a)(2)(A)(iii), the Debtors are awarded $2000 in damages. In addition, the Debtors' interest rate shall be lessened by 1.1% and 1.1% of the interest paid to date shall be refunded to the Debtors. In addition, the Debtors are due the $3,500.00 broker fee; the $370.00 processing and underwriting fee; as well as their costs and attorneys fees and any actual damages sustained as a result of the lender's actions and that of its agent.

---

1. We note that a rescission letter was sent to Equicredit by Debtor's counsel on February 21, 2001. Under 12 C.F.R. § 226.23(d)(2), the lender has 20 days from the date of receipt in which to respond. By this time the Debtors plan had been confirmed.