Michael L. SHORT, Plaintiff,

v.

**WELLS FARGO BANK MINNESOTA, N.A.; Countrywide Home Loans, Inc.; Tri–State Title, Inc., a corporation; Bonnie Sue Fleming; and, Douglas M. Legg, Defendants.**

No. CIV.A. 3:04–1096.

United States District Court,
S.D. West Virginia
at Huntington.

Nov. 18, 2005.

Flanagan, Charleston, WV, for Defendants.

## MEMORANDUM OPINION AND ORDER

CHAMBERS, District Judge.

Pending is a motion for summary judgment brought by defendants Countrywide Home Loans, Inc. (hereinafter "Countrywide") and Wells Fargo Bank Minnesota, N.A. (hereinafter "Wells Fargo") pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is **GRANTED in part** and **DENIED in part.**

### I

On April 15, 2005, the plaintiff Michael L. Short filed an eight count amended complaint against defendants Wells Fargo; Countrywide; Tri–State Title, Inc. (hereinafter "Tri–State"); Bonnie Sue Fleming (hereinafter "Fleming"); and Douglas M. Legg (hereinafter "Legg"). The plaintiff has named defendants Wells Fargo and Countrywide in six of the eight counts in his amended complaint. Specifically, defendants Wells Fargo and Countrywide are named in Count I for violating the Truth in Lending Act (hereinafter "TILA"). Defendants Wells Fargo and Countrywide are named in Count II for unconscionable contract in violation of the West Virginia Consumer Credit and Protection Act as well as defendants Tri–State, Legg and Fleming. Defendant Countrywide is named in Count III for breach of its duty of good faith and fair dealing. Defendant Countrywide is named in Count IV for unauthorized charges. Defendant Countrywide is named in Count V for failure to provide statements of account, and defendants Wells Fargo and Countrywide are named in Count VIII for joint venture, conspiracy and agency as

Bren J. Pomponio, Daniel F. Hedges, Heather E. W. Walsh, Mountain State Justice, Inc., Charleston, WV, for Plaintiff.

Bruce M. Jacobs, H. Dill Battle, III, Scott Palmer Mason, Spilman Thomas & Battle, Julie M. Meeks, Stephen M. Fowler, Travis A. Griffith, Pullin Fowler &

well as defendants Tri–State, Legg and Fleming.

The amended complaint alleges the following facts: In April of 2000, the plaintiff spoke to a loan officer for Delta Funding and applied for a mortgage loan to refinance his home. On June 2, 2000, a man called the plaintiff at approximately 11:00 P.M. The man told the plaintiff that he had the loan documents for closing plaintiff's loan and asked for permission to come by plaintiff's residence to close the loan. At approximately 1:45 A.M., the man showed up at plaintiff's residence and presented a large stack of papers, directing him where to initial and sign. From plaintiff's review of the Deed of Trust, he asserts that the man was Legg. Plaintiff was approached again a few weeks later by a different man in a car and asked to sign additional papers. Plaintiff was never provided any copies of the loan documents he signed nor was he given any explanation of their content at the closing.

In July, 2000, plaintiff received notice to send his loan payments to Countrywide. Subsequently, in November or December of 2003, plaintiff received notice that he owed two payments in one month. After several unsuccessful attempts at contacting Countrywide's customer service, plaintiff was informed that he owed approximately $893.00 plus attorney fees and other fines. Plaintiff was told it would take fourteen days to determine the amount of the attorney fees. Countrywide's counsel later informed him that the attorney fees were $1,092.00, making the total amount due $1,985.00. Plaintiff remitted payment of the entire amount to Countrywide by certified check.

Following the above instance, plaintiff continued to have difficulties surrounding his loan. In January of 2004, plaintiff sent a money order to Countrywide; however, it was rejected. In March, 2004, he called

Countrywide to inquire as to why he was not receiving his monthly statements on time. He was informed by Countrywide, that because his home had been in foreclosure and was now out, the computer took time to get the statements out on schedule. On a separate occasion, plaintiff inquired about certain charges on his account and was told that Countrywide had mistakenly charged him fees that could not legally be charged in West Virginia. His account, however, was never properly credited. Following these difficulties, he filed the present action in this Court.

On August 22, 2005, defendants Wells Fargo and Countrywide filed the pending motion for summary judgment. The defendants argue that they are entitled to relief on the following grounds: With regard to the claims against Wells Fargo in Counts I and II, they argue that Wells Fargo, as the holder of the Note, is a holder-in-due-course and, thus, is insulated from plaintiff's origination claims. They also argue that Wells Fargo, as an assignee of the Note, cannot be held liable for any claims by plaintiff stemming from the origination of the loan pursuant to 15 U.S.C. § 1641(e). With regard to the claims against Countrywide in Counts I and II, they argue that Countrywide, as the servicer of the loan, cannot be held liable for any claims by plaintiff stemming from the origination of the loan pursuant to 15 U.S.C. § 1641(f). With regard to Count VIII, they argue that they exercised no control over Tri–State, Legg and Fleming. They also argue that there is no evidence that they and the other defendants had an express or implied agreement to share profits and that, absent such an agreement, plaintiff's claim that a joint venture existed among them must fail as a matter of law.

The Court will address each of defendants' grounds for relief seriatim, and ad-

ditional facts will be introduced as they relate to the arguments for relief.

## II

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c) (2005). Moreover, the rule also provides, in relevant part, as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e) (2005). In discussing this standard, the U.S. Supreme Court stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"[I]n assessing a motion for summary judgment all justifiable inferences must be drawn in favor of the nonmoving party for '[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts.'" *Drewitt v. Pratt,* 999 F.2d 774, 778 (4th Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Hence, "[t]he court 'must perform a dual inquiry into the genuineness and materiality of any purported factual issues.'" 999 F.2d at 778 (quoting *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985)).

The substantive law identifies facts that are material. Consequently, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgement. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Ross,* 759 F.2d at 364. Therefore, in reviewing the evidence, a judge must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. If no genuine issue of material fact exists,

the Court has an obligation "to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548).

Finally, when a party's "state of mind" is a decisive element of a claim or defense, summary judgment is seldom appropriate because "state of mind" determinations usually depend on the credibility of witnesses or the resolution of conflicting inferences drawn from circumstantial or self-serving evidence. *Thacker v. Peak,* 800 F.Supp. 372, 376 (S.D.W.Va.1992) (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) and *Ross,* 759 F.2d at 364). Nevertheless, even if motive is material, summary judgment is not precluded if the claim rests solely on unsupported allegations. *Id.* (citing *Ross,* 759 F.2d at 365).

### III

#### A

Starting with the TILA and the unconscionable contract claims against Wells Fargo, the defendants assert that Wells Fargo, as assignee, took possession of plaintiff's mortgage loan in good faith, for value, and without notice and that the loan on its face was not in any way invalid or the product of unlawful acts. As a result, Wells Fargo is a holder-in-due-course and is insulated from plaintiff's allegations of origination errors and damages for violations of TILA. The defendants also argue that, as the assignee of the loan from Delta Funding, Wells Fargo cannot be held liable for plaintiff's TILA claim because the disclosures were made and that if there was any failure by Tri–State, Fleming or Legg to deliver said documents to plaintiff, the error was not apparent on the face of the disclosure statements. Finally, the defendants argue that, in accordance with 15 U.S.C. §.1641(e), TILA only requires Wells Fargo to examine the face of the documents for any irregularities, and in the absence of such, it is not required to make any inquiries. Consequently, it is entitled to be dismissed as a matter of law.

In response, the plaintiff argues that his loan is a high cost loan under the Home Equity and Ownership Protection Act of 1994 (hereinafter "HOEPA"), and as such, Wells Fargo is subject to all claims and defenses as the holder of the loan, pursuant to 15 U.S.C. § 1641(d)(1). Plaintiff also points out that his note (loan) recognizes that it is a HOEPA loan by the typed-in statement at the bottom of the note. Thus, Wells Fargo, as the holder, cannot claim any protected status given the strict liability standard for assignees of high cost loans under HOEPA. In support of this argument, plaintiff points to *In re Rodrigues,* 278 B.R. 683, 688 (Bankr. D.R.I.2002). In addition, plaintiff argues that this protection runs against the holder-in-due-course status for any claims under state or federal law. In support of this assertion, plaintiff points to *Cooper v. First Government Mortgage & Inv. Corp.,* 238 F.Supp.2d 50, 55 (D.D.C.2002) (holding that "Congress made assignees subject to all claims and defenses, whether under TILA or other law that could be raised against the original lender."); *Vandenbroeck v. Contimortgage Corp.,* 53 F.Supp.2d 965, 968 (W.D.Mich.1999) (holding that "The language of subsection (1) provides in clear and unambiguous terms that assignees are subject to all claims and defenses under any law that a borrower could have asserted against the original lender."); *Bryant v. Mortgage Capital Resource Corp.,* 197 F.Supp.2d 1357, 1364 (N.D.Ga.2002); *In re Rodrigues,* 278 B.R. at 688; and *Dash v. Firstplus Home Loan Trust 1996–2,* 248 F.Supp.2d 489, 505 (M.D.N.C.2003). Finally, even if HOEPA

does not apply to his loan, plaintiff asserts that Wells Fargo has the burden of proving holder-in-due-course status and that a general business relationship between a payee and assignee of an instrument may be sufficient, in itself, to deny the purchaser protected status. In support of this argument, plaintiff points to W.Va.Code § 46–3–308(b); *England v. MG Investments,* 93 F.Supp.2d 718, 723 (S.D.W.Va. 2000); *Tipton v. Secretary of Educ.,* 768 F.Supp. 540, 565–69 (S.D.W.Va.1991); Restatement (Second) of Contracts § 366 (1981); *Maryland Fin. Corp. v. People's Bank,* 99 W.Va. 230, 128 S.E. 294, 296 (1925) (stating: "It is well settled that a general business relation between the payee and the holder may be considered as giving character to a particular transaction, and is affording an inference that a paper ... was ... [assigned] with constructive notice of any existing infirmity."); and *Miller v. Diversified Loan Serv. Co.,* 181 W.Va. 320, 324, 382 S.E.2d 514, 518 (1962) (stating "It is generally held that if the financial institution exercises control over the creditors by ... determining the amount of the credit extended and its terms, such interconnectedness precludes the financing company from becoming a holder in due course.").

In reply, the defendants argue that plaintiff's loan is not a high cost loan under HOEPA and is not subject to any special protections under the statute because the plaintiff did not pay any points or fees at or before closing. Specifically, defendants contend that 15 U.S.C. § 1602(aa) provides that TILA protection only applies if the total points and fees payable by the consumer at or before closing satisfy a certain threshold amount and that the fees and costs associated with the loan at issue here were financed. As the plaintiff paid nothing at closing, the defendants argue that his loan is not a high cost loan as defined by the statute and that he is not entitled to

HOEPA protection. In support of this assertion, defendants point to *Terry v. Community Bank of Northern Virginia,* 255 F.Supp.2d 811, 817 (W.D.Tenn., 2003); *Nunn v. IMC Mortgage Company,* 308 B.R. 150 (2004); and *Collins v. Countrywide Home Loans, et. al.,* 310 B.R. 299 (2004).

In his surreply, the plaintiff argues that the holding in *Terry* is wrong because it would remove ninety-five percent of all brokered loans from HOEPA coverage, and he urges the Court to hold that financed fees are in essence fees paid at closing by the consumer satisfying § 1602(aa) and triggering HOEPA protection. In support of this assertion, he points to the Official Staff Commentary of the Federal Reserve Board concerning § 226.32(b)(1)(ii) and to *Cunningham v. EquiCredit Corp. of Ill.,* 256 F.Supp.2d 785 (N.D.Ill.2003).

In 1968, Congress enacted TILA, a federal statute that governs the terms and conditions of consumer credit by, *inter alia,* requiring lenders to disclose certain details about loans and their fees and costs. 15 U.S.C. § 1601 *et seq.* Congress intended TILA to assure a meaningful disclosure of credit terms so that consumers would not be misled as to the costs of financing. *Id.* Due to abusive practices in home mortgage lending, Congress enacted HOEPA in 1994 as an amendment to TILA. HOEPA requires lenders to provide borrowers with additional disclosures, in conspicuous type size, with respect to certain home mortgages. 15 U.S.C. § 1639(a)(1). Congress intended HOEPA to result in greater disclosure to borrowers involved in high cost loans and to stop certain loan terms and practices. 15 U.S.C. § 1639. "The legislative history of HOEPA demonstrates that Congress enacted HOEPA to force the high cost mortgage market to police itself." *Dash v.*

*Firstplus Home Loan Trust 1996–2,* 248 F.Supp.2d 489, 505 (M.D.N.C.2003).

TILA imposes two different standards of care for assignees. Pursuant to 15 U.S.C. § 1641(e), assignee liability regarding a non-high cost mortgage loan is limited to violations that are apparent on the face of the disclosure statement.[1] In contrast to the "apparent on the face" standard, pursuant to 15 U.S.C. § 1641(d)(1), assignee liability regarding a high cost mortgage loan (also known as a "HOEPA loan") is more expansive and subjects assignees to all claims and defenses, whether under TILA or other law, that could be raised against the original lender.[2] In other words, § 1641(d)(1) eliminates an assignee's holder-in-due-course defense to all claims asserted by a consumer under TILA or other laws. Section 1641(d)(1) also makes clear that an assignee of a defective HOEPA loan has only one defense: that at the time of assignment, the assignee was without notice that the loan in question was a HOEPA loan.

In order for a mortgage loan to be considered a HOEPA loan and qualify for its protection, it must satisfy the criteria outlined in 15 U.S.C. § 1602(aa). Section 1602(aa) provides, in pertinent part, as follows:

A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if—

. . .

(B) the total points and fees payable by the consumer at or before closing will exceed the greater of—

(i) 8 percent of the total loan amount; or

(ii) $400.

15 U.S.C. § 1602(aa). *See also* 12 C.F.R. § 226.32(a)(1)(ii).

Regulation Z, 12 C.F.R. § 226.1, *et seq.*, which implements TILA and HOEPA, defines points and fees as including the following:[3]

---

**1.** Section 1641(e) provides, in pertinent part, as follows:

Except as otherwise specifically provided in this subchapter, any civil action against a creditor for a violation of this subchapter, and any proceeding under section 1607 of this title against a creditor, with respect to a consumer credit transaction secured by real property may be maintained against any assignee of such creditor only if—

(A) the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement provided in connection with such transaction pursuant to this subchapter; and

(B) the assignment to the assignee was voluntary.

15 U.S.C. § 1641(e).

**2.** Section 1641(d)(1) provides, in pertinent part, as follows:

Any person who purchases or is otherwise assigned a mortgage referred to in section 1602(aa) of this title shall be subject to all claims and defenses with respect to the mortgage that the consumer could assert against the creditor of the mortgage, unless the purchaser or assignee demonstrates, by a preponderance of the evidence, that a reasonable person exercising ordinary due diligence, could not determine, based on the documentation required by this subchapter, the itemization of the amount financed, and other disclosure of disbursements that the mortgage was a mortgage referred to in section 1602(aa) of this title. The preceding sentence does not affect rights of a consumer under subsection (a), (b), or (c) of this section or any other provision of this subchapter.

15 U.S.C. § 1641(d)(1).

**3.** TILA vests the Federal Reserve Board with power to promulgate regulations regarding the interpretation and implementation of the Act. *See* 15 U.S.C. § 1604(a). Moreover, the U.S. Supreme Court has upheld this delegation of authority. *See Mourning v. Family*

(1) For purposes of paragraph (a)(1)(ii) of this section, *points and fees* means:

(i) All items required to be disclosed under § 226.4(a) and 226.4(b), except interest or the time-price differential;

(ii) All compensation paid to mortgage brokers;

(iii) All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and

(iv) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for cancellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

12 C.F.R. § 226.32(b)(1) (2005). With regard to § 226.32(b)(1)(ii), the Federal Reserve Board's Official Staff Interpretation provides:

1. *Mortgage broker fees.* In determining "points and fees" for purposes of this section, compensation paid by a consumer to a mortgage broker (directly or through the creditor for delivery to the broker) is included in the calculation whether or not the amount is disclosed as a finance charge. Mortgage broker fees that are not paid by the consumer are not included. Mortgage broker fees already included in the calculation as financed charges under section 226.32(b)(1)(I) need not be counted again under section 226.32(b)(1)(ii).

*Publications Serv.,* 411 U.S. 356, 93 S.Ct.

12 C.F.R. Pt. 226, Supp. I, ¶ 32(b)(1)(ii) (2005).

Items required to be listed under § 226.4(c)(7) are:

(7) *Real-estate related fees.* The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount:

(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.

(ii) Fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents.

(iii) Notary and credit report fees.

(iv) Property appraisal fees or fees for inspection to assess the value or condition of the property if the service is performed prior to closing, including fees related to pest infestation or flood hazard determinations.

(v) Amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge.

12 C.F.R. § 226.4(c)(7) (2005).

■ The issue at hand in the instant case is whether plaintiff qualifies as a holder of a high cost HOEPA loan. In resolving this issue, the defendants argue that the Court should employ the statutory interpretation of 15 U.S.C. § 1602(aa) as outlined in *Terry.* In response, the plaintiff argues that the holding in *Terry* is wrong and that the broker fees should be considered paid at closing pursuant to the Federal Reserve Board's Official Staff Interpretation of § 226.32(b)(1)(ii) and the holding in *Cunningham.*

The following cases support the defendants position: In *Terry,* the plaintiffs re-

1652, 36 L.Ed.2d 318 (1973).

financed their existing mortgage home equity loan in 1999. The loan was originated by Guaranty National Bank of Tallahassee (hereinafter "GNBT"). The principal amount of the loan was $57,000.00 and was subject to an interest rate of 15.971%. The settlement statement indicated that the following costs and fees were paid to GNBT: a $5,700.00 loan origination fee, a $1,140.00 loan discount fee, a $95.00 application fee, and a $185.00 underwriting fee. The following charges were paid to Title America: a $200.00 closing fee, a $115.00 title search fee, a $300.00 title exam fee, a $25.00 overnight fee, a $260.00 document review fee, a $250.00 processing fee, and a $94.25 recording fee. The origination and title fees were added to the principal of the loan, requiring the plaintiffs to pay nothing at closing.

District Judge Donald held:

Title 15 U.S.C. § 1602(aa)(1) plainly states that unless a mortgage satisfies § 1602(aa)(1)(A), the loan qualifies for TILA protections only if "the total points and fees payable by the consumer at or before closing" meet a certain threshold amount. 15 U.S.C. § 1602(aa)(1)(B) (emphasis added). There have been no allegation that Plaintiffs' loans are covered by § 1602(aa)(1)(A). Thus, for RFC to be liable, Plaintiffs must meet the criteria stated in § 1602(aa)(1)(B).

Black's Law Dictionary defines "payable" as follows:

Capable of being paid; suitable to be paid; admitting or demanding payment; justly due; legally enforceable. A sum of money is said to be payable when a person is under an obligation to pay it. Payable may therefore signify an obligation to pay at a future time, but, when used without qualification, [the] term normally means that the debt is payable at once, as opposed to owing.

Black's Law Dictionary 1016 (6th ed.1979) (emphasis added). Under this definition, even if the time for payment of points and fees on a "high cost" loan was unspecified, the points and fees would be "payable at once," as opposed to over the course of a loan. However, Congress specifically qualified the term "payable" with a time certain—i.e. the points and fees must be payable "at or before closing." 15 U.S.C. § 1602(aa)(1)(B). There is nothing ambiguous about the language of § 1602(aa)(1)(B) which lends to another interpretation of this statute. Accordingly, the Court finds that a mortgage qualifies for TILA protections only where the mortgagor is required to pay certain points and fees at or before closing of a loan, not over the course of the loan.

*Terry*, 255 F.Supp.2d at 816–17 (footnote omitted). Based upon the above reasoning, Judge Donald held that plaintiff's loan did not qualify as a high cost HOEPA loan because plaintiff had paid nothing at closing.

In *Mourer v. Equicredit Corp. of America and Cascade Capital Funding,* 287 B.R. 889 (Bankr.W.D.Mich.2003), the plaintiffs were contacted by a mortgage broker named Cascade Capital Funding LLC. Cascade told the plaintiff that they might be eligible for a 10% mortgage rate and that they would be able to borrow enough money to pay off their car loan and some over due taxes. At the closing, the plaintiffs discovered that their house was being refinanced at an interest rate of 13.3729%. They admitted that they could have refused to close the loan, but felt they had no choice because their house and car payments were already late. The amount financed by Equicredit, the lender, was

$58,228.00. From these proceeds the plaintiffs' previous mortgage was satisfied, their car loan was paid in full, their delinquent taxes were paid and they received $5,006.01 in cash. The points and fees associated with the loan paid by the plaintiffs included a $3,500.00 broker fee, a processing and underwriting fee of $370.00 and a yield spread premium (hereinafter "YSP") of $1,248.00. A YSP is a fee paid by the lender to the mortgage broker. The lender recoups this fee by charging the borrower a slightly higher interest rate. The issue in *Mourer* was whether the YSP should be included in the fees paid by the borrower. If the YSP was included in the fee calculation then the loan was a high cost HOEPA loan. There is no indication from the facts of this case that the defendants disputed the counting of the broker fee and underwriting fee in the calculation of whether HOEPA protection was triggered.

Bankruptcy Judge Jo Ann C. Stevenson provided the following analysis concerning whether the YSP should be counted in the calculation of whether HOEPA protection was triggered:

> In this case, the yield spread premium is being paid by the consumer in the form of a higher interest rate. Interest is not an item that is paid up front, out of pocket at closing, but throughout the life of the loan. Consequently, Equicredit argues that because it is not mandatory that this fee be disclosed as a finance charge it should not be included in its calculation.
>
> However, we find that by virtue of the definition of a finance charge found in § 226.4(a) and consistent with the special rule regarding mortgage broker fees in § 226.4(a)(3), the yield spread premium would be a finance charge indirectly paid by the consumer incident to the extension of credit.

We come to this conclusion primarily by looking to the spirit of the law. "Not the letter, but the spirit: for the letter killeth, but the spirit giveth life." *The Second Epistle of Paul the Apostle to the Corinthians* 3:6.

287 B.R. at 894. Based upon the above reasoning, Judge Stevenson held that the YSP of $1,248.00 EquiCredit paid to Cascade should be included in calculating whether the points and fees exceed 8% of the total loan amount thereby activating HOEPA protection.

In response to Judge Stevenson's decision, EquiCredit appealed to the district court. In *Mourer v. Equicredit Corp. of America*, 309 B.R. 502 (W.D.Mich.2004), United States District Judge McKeague overturned Judge Stevenson's decision and provided the following reasoning:

> In holding that the YSP of $1,248 paid by EquiCredit to Cascase, and ultimately to be paid by the Mourers to Equi-Credit over the course of the loan (in the form of a 1.1%—enhanced interest rate on the borrowed principal) was a "fee payable by the consumer at or before the loan closing" under 12 C.F.R. § 226.32(a)(1)(ii), the bankruptcy court concededly overlooked the "letter of the law" in order to enforce the "spirit of the law." The court properly observed that TILA is a remedial statute and should be construed liberally in favor of the consumer. *Pfennig v. Household Credit Services, Inc.*, 286 F.3d 340, 344 (6th Cir.2002). The court also properly concluded that the YSP is a finance charge or fee that is indirectly paid by the Mourers. It is also true that the purpose of TILA, to assure meaningful disclosure of credit terms to consumers, *see id.*, would arguably be better served by requiring full disclosure of the YSP.
>
> Yet, although the courts are obliged to construe the law so as to effectuate its

purpose, this duty does not include license to ignore the law's clear and unambiguous terms or to refrain from enforcing them in accordance with their plain meaning. *See United States v. Miami University*, 294 F.3d 797, 812 (6th Cir.2002) (observing that when a law's meaning is plain and unambiguous on its face, the court's task to construe it is at an end). The bankruptcy court's holding that the YSP is a fee that must be included in the calculation of the 8% trigger of 12 C.F.R. § 226.32(a)(1)(ii) flies in the face of the very provision's express inclusion only of "fees payable by the consumer at or before loan closing." There is no evidence or even contention that the Mourers paid the YSP at or before loan closing. The YSP was paid by EquiCredit to Cascade at the time of closing, but to the extent this obligation was payable by the Mourers, it was payable in the form of a higher interest rate, not at or before the closing, but over the course of the loan. It necessarily follows that the YSP is not properly included in the calculation of the 8% trigger. The bankruptcy court's contrary conclusion is not supported by any case law authority. Nor have the Mourers identified any.

TILA is a remedial statute. It is also highly technical. *Pfennig*, 286 F.3d at 344. To impose requirements on lenders at odds with the plain meaning of the express terms of Regulation Z is simply not fair and is contrary to law. Accordingly, the bankruptcy court's ruling is in this respect overturned.

309 B.R. at 505. *See also Nunn v. IMC Mortgage Co.*, 308 B.R. 150 (W.D.N.Y. 2004) (holding that the portion of mortgage broker's fee which borrower did not pay directly, but financed through her lender by paying slightly higher rate of interest over course of loan, did not have to be included with points and fees paid directly by borrower at closing, for purposes of deciding whether the points and fees paid exceeded 8% of the total loan amount, so as to make the loan subject to the requirements of HOEPA); *Collins v. Canton Home Improvement*, 310 B.R. 299 (Bankr.N.D.Miss.2004) (same); and *Sigle v. Canton Home Improvement*, 310 B.R. 303 (Bankr.N.D.Miss.2004) (same).

Plaintiff, on the other hand, urges the Court to follow *Cunningham* rather than *Terry* and to distinguish the YSP cases (*Mourer, Nunn, Collins* and *Sigle*) from the facts at hand. In *Cunningham*, the plaintiff's home was in disrepair. Consequently, she contacted defendant Marvin Hunter, a home improvement contractor, in order to discuss repairing her home. Mr. Hunter informed the plaintiff that he could make the necessary repairs and referred her to defendant The Loan Center, a mortgage broker, in order to obtain financing for the repairs. After meeting with a representative from The Loan Center, the plaintiff agreed to refinance her existing mortgage through a new loan in the amount of $95,200.00 payable over a thirty-year term. The Loan Center submitted plaintiff's loan application to defendant EquiCredit (the lender) as part of the underwriting process. At the closing, the plaintiff received a settlement statement, and it indicated that The Loan Center received a broker's fee in the amount of $6,350.00. The plaintiff alleged, however, that The Loan Center also took an additional fee or kickback from the $10,500.00 paid to D & E Services from the closing proceeds. In determining whether HOEPA protection was triggered, United States Magistrate Judge Levin held:

The Court finds that EquiCredit's contention that there is no statutory violation because the alleged disguised broker's fee or kickback from D & E Services to The Loan Center does not

qualify as points and fees because it was not made "at or before closing" to be unavailing. 15 U.S.C. § 1602(aa)(1)(B). In this regard, Equi-Credit, respectfully, has omitted pertinent statutory language. The applicable clause at issue does not require "payment" at or before closing. Rather, the subject clause expressly provides that a mortgage that is subject to HOE-PA requirements is one where "the total points and fees *payable* by the consumer *at or before closing*" exceed 8 percent of the total loan amount.

256 F.Supp.2d at 793 (emphasis in original).

In the case *sub judice,* the plaintiff testified that he wanted $2,000.00 to $4,000.00 over the payoff on his first mortgage in order to payoff some small bills and to take a weekend trip. (Short Dep. at 62.) The settlement statement indicates that the principal amount of plaintiff's loan was $35,000.00. In the section labeled "Gross Amount Due From Borrower," it indicates that settlement charges to borrower were $6,724.99, that the plaintiff owed $17,610.86 on his first mortgage and $118.09 on his second mortgage. The statement also indicated that the plaintiff received $10,546.06 in cash. On the second page of the settlement statement, there is a list of settlement charges that are characterized as "PAID FROM BORROWER'S FUNDS AT SETTLEMENT." The charges are as follows: Four Seasons received $475.00 for an appraisal. Delta Funding Corporation received $495.00 for processing the loan, $76.00 for tax services and $20.00 for flood certification. Equity South Mortgage received $2,950.00 for brokerage services.

State Farm Insurance received $150.49 for providing hazard insurance. Tri–State Title, Inc. received $150.00 for closing the loan, $50.00 for courier service, $430.00 for title examination, $25.00 for fax service and $25.00 for wire service. Bonnie S. Fleming, Esq. received $65.00 for document preparation. First American Title Insurance Company received $135.00 for providing title insurance. Recording fees were $30.50. Lowes/MCCBG received $536.00. Bank First received two payments, one for $463.00 and another for $649.00. (Pl.['s] Resp. Ex. H.)

Unlike the facts in *Terry,* here the second page of the plaintiff's settlement statement indicates that the fees were paid from borrower's funds at settlement. Thus, on its face the lender acknowledged that the fees were paid by the plaintiff. In *Mourer,* the issue was whether the YSP of $1,248.00 could be included in calculating whether the points and fees exceeded 8% of the total loan amount triggering HOE-PA protection. The YSP of $1,248.00 was paid by the lender to the broker on behalf of the borrower in exchange for the borrower paying a slightly higher interest rate. Neither the defendants nor Judge McKeague, however, took issue with the $3,500.00 broker fee and the $370.00 underwriting fee being counted in the calculation of whether HOEPA was triggered. Given that the borrowers were behind on their home and car payments, it is likely that the broker fee and the underwriting fee were deducted from the cash the borrower received and were apparently considered by the parties and the court as paid at closing by the borrower.[4] In the

---

4. While the Court finds the YSP cases (*Mourer, Nunn, Collins* and *Sigle*) to be helpful, the cases are clearly distinguishable from *Terry* because the lenders in the YSP cases actual paid the broker fees at issue without any guarantee that the fees would be recouped,

given that the borrowers had the legal right to pay their loans off early. In other words, unlike the borrower in *Terry,* the borrowers in the YSP cases were never legally obligated to reimburse the lenders for paying the fees in question.

instant case, it appears from the settlement statement that $6,724.99 in settlement charges were paid out of the $35,000.00 loaned to the plaintiff. Thus, whether plaintiff would have received that amount at his closing as well as $10,546.06 and then had the responsibility of individually paying the various service providers for obtaining his loan or whether that amount was disbursed to the service providers on his behalf is immaterial because both processes result in the same outcome. As the lender acknowledged in the settlement statement that the fees were paid by the borrower, and as the $6,724.99 in settlement charges were paid out of the $35,000.00 loaned rather than added to the principal, the Court finds that a reasonable jury could find that the settlement charges were paid by the plaintiff at the closing of his loan. As there is a genuine issue of material fact, the Court denies summary judgment.

Next, the Court must examine which settlement charges count in the calculation of whether HOEPA protection is triggered. In order to trigger HOEPA in this case, the total points and fees must exceed 8% of $35,000.00 or $2,800.00. Pursuant to 12 C.F.R. § 226.32(b)(1)(ii), the broker fee of $2,950.00 would count in the calculation. Pursuant to 12 C.F.R. § 226.32(b)(1)(iii), the following would also count in the calculation: $430.00 title examination fee, $65.00 document preparation fee, $135.00 title insurance fee, $475.00 appraisal fee, 495.00 processing fee, $76.00 tax service fee and $20.00 flood certification fee. The total for the above counted fees is $4,646.00 or 13% of the loan. As the points and fees paid by the plaintiff at closing clearly exceed the 8% trigger, the Court holds that a reasonable jury could conclude that the plaintiff is entitled to HOEPA protection (elimination of the holder-in-due-course defense) and that Wells Fargo, as assignee, is subject to all claims and defenses, whether under TILA or other law, that could be raised against Delta Funding Corporation. As there is a genuine issue of material fact, the motion to dismiss Wells Fargo from Counts I and II is denied.

■ Although the facts in this case make it unnecessary for the Court at the summary judgment stage to further interpret the phrase "payable by the consumer at or before closing" in 15 U.S.C. § 1602(aa), nevertheless, this Court finds the interpretation of that phrase by Judge Donald and Judge McKeague to be inapposite to the meaning Congress intended. Instead, the term "payable" should be interpreted as meaning "legally enforceable" or "obligation to pay." Moreover, it appears from the Federal Reserve Board's Official Staff Interpretation of 12 C.F.R. § 226.32(b)(1)(ii) that fees paid to a mortgage broker directly or indirectly are included in the calculation of fees and points. The Court notes that neither Judge Donald in *Terry* nor Judge McKeague in *Mourer* acknowledged this interpretation by the Federal Reserve Board, whose responsibility it is to interpret and implement TILA. Finally, while TILA is highly technical, it is a remedial statute. *See Pfennig v. Household Credit Services, Inc.,* 286 F.3d 340, 344 (6th Cir.2002). It was designed to protect consumers like the plaintiff here, not more sophisticated lending and financial institutions, who are able to control the structure of the loan transaction. Congress did not use the term "paid" in § 1602(aa), instead, it used the term "payable" which looks to the fact that the consumer bears the cost of those fees at the time of closing, not whether those fees were financed, paid separately or deducted from the loan proceeds. Given the statute's remedial purpose, the Court believes that to allow lenders and financial institutions to manipulate the payment of points and fees in these transactions to

avoid triggering the HOEPA protections is unfair and defeats the purpose of the law. Accordingly, this Court agrees with the plaintiff that *Terry* and its progeny have been wrongly decided.

### B

Turning to the TILA and the unconscionable contract claims against Countrywide, the defendants argue that Countrywide, as the servicer of the loan, cannot be held liable for any claims by the plaintiff stemming from the origination of the loan by Delta Funding pursuant to 15 U.S.C. § 1641(f). In his response, the plaintiff did not respond to this argument.

15 U.S.C. § 1641(f) provides, in pertinent part, as follows:

**(f) Treatment of servicer**

**(1) In general**

A servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for purposes of this section unless the servicer is or was the owner of the obligation.

15 U.S.C. § 1641(f).

As there appears to be no dispute among the parties that Countrywide merely provided administrative functions in servicing the loan, and as the plaintiff does not object to the motion to dismiss his TILA and unconscionable contract claims against Countrywide, the Court, in accordance with § 1641(f), grants the motion with respect to both claims.

### C

Next, defendants argue that the plaintiff has failed to produce any agreement between Countrywide, Wells Fargo and Tri-State sufficient to satisfy the necessary requirements to sustain a claim of joint venture and that the plaintiff has failed to provide any evidence of any control over Tri-State by either Countrywide or Wells Fargo. In response, the plaintiff points to a Pooling and Servicing Agreement (hereinafter "PSA") entered into by Countrywide, Wells Fargo and Delta Funding Corporation as proof of a joint venture between them. The plaintiff also acknowledges that Tri-State, Fleming and Legg are not parties of that agreement, but argues that they were agents of Delta Funding Corporation. Thus, Countrywide and Wells Fargo are liable for their actions under the doctrine of jointly and severally liable for the actions of their joint venturer, Delta Funding Corporation.

■■■■ Under West Virginia law, a "joint venture" is defined as "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge." *Armor v. Lantz,* 207 W.Va. 672, 677, 535 S.E.2d 737, 742 (2000); *Holland v. High Power Energy,* 98 F.Supp.2d 741, 745 (S.D.W.Va.2000). "[A] joint venture arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied." *Price v. Halstead,* 177 W.Va. 592, 595, 355 S.E.2d 380, 384 (1987); *accord Sipple v. Starr,* 205 W.Va. 717, 725, 520 S.E.2d 884, 892 (1999). "[M]embers of a joint venture are … jointly and severally liable for all obligations pertaining to the joint venture, and the actions of the joint venture bind the individual co-venturers." *Armor,* 207 W.Va. at 677, 535 S.E.2d. at 742. In addition, each venturer is liable for the unlawful acts of a co-venturer when the act is committed within the scope of the venture and with the implied consent of the venturer. *See* 46 Am.Jur.2d *Joint Ventures* § 42.

In *Armor,* the court identified the following elements as essential to a joint venture:

This Court has never formulated any broad analytical test by which to determine the existence of a joint venture. In *Pownall v. Cearfoss,* 129 W.Va. 487, 40 S.E.2d 886 (1946), however, the Court did note the existence of certain "distinguishing elements or features" essential to the creation of a joint venture:

As between the parties, a contract, written or verbal, is essential to create the relation of joint adventurers ....

To constitute a joint adventure the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character. There must, however, be some contribution by each party of something promotive of the enterprise.... An agreement, express or implied, for the sharing of profits is generally considered essential to the creation of a joint adventure, and it has been held that, at common law, in order to constitute a joint adventure, there must be an agreement to share in both the profits and the losses. It has also been held, however, that the sharing of losses is not essential, or at least that there need not be a specific agreement to share the losses, and that, if the nature of the undertaking is such that no losses, other than those of time and labor in carrying out the enterprise, are likely to occur, an agreement to divide the profits may suffice to make it a joint adventure, even in the absence of a provision to share the losses.

*Id.* at 497–98, 40 S.E.2d at 893–94 (citations omitted) (footnote added). *See also Lilly v. Munsey,* 135 W.Va. at 254,

63 S.E.2d at 523 ("to constitute a joint adventure there must be an agreement to combine property or efforts and to share in profits."). Whether or not a joint venture exists is normally a question to be answered by the trier of fact. *See Bowers v. Wurzburg,* 207 W.Va. 28, 528 S.E.2d 475, 484 (1999).

207 W.Va. at 678, 535 S.E.2d at 743 (footnote omitted).

In *Arnold v. United Companies Lending Corporation,* 204 W.Va. 229, 511 S.E.2d 854 (1998), the court stated:

[O]ne must examine the facts of a particular case to determine whether an agency relationship exists. But " '[p]roof of an express contract of agency is not essential to the establishment of the relation. It may be inferred from facts and circumstances, including conduct.' " *General Elec. Credit Corp. v. Fields,* 148 W.Va. 176, 181, 133 S.E.2d 780, 783 (1963). In syllabus Point 2 of *Thomson v. McGinnis,* 195 W.Va. 465, 465 S.E.2d 922 (1995), this Court stated:

"One of the essential elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent." Syl. Pt. 3, *Teter v. Old Colony Co.,* 190 W.Va. 711, 441 S.E.2d 728 (1994).

*See Peters v. Riley,* 73 W.Va. 785, 791, 81 S.E. 530, 532 (1914) (no agency found where "[a]ll the essential elements of the contract remained in the sole and exclusive control of the defendant"); *see also Wright & Souza, Inc. v. DM Properties,* 1 Neb.App. 822, 510 N.W.2d 413 (1993) (prospective borrower failed to establish that loan broker acted as borrower's agent where borrower had no control over broker). This Court further stated in *Thomson* that a principal denying agency must show that the principal nei-

ther controlled, nor had the right to control, the work, and "where factual conflict exists regarding the degree of control exercised and the nature of the relationship thereby created, jury resolution is warranted." 195 W.Va. at 470, 465 S.E.2d at 927. 204 W.Va. at 239–40, 511 S.E.2d at 864–65.

■ In the case *sub judice*, after reviewing the PSA, it appears that there was an agreement to pool and service mortgages between Delta Funding Corporation, as seller; Countrywide, as servicer; and Norwest Bank Minnesota, National Association or Wells Fargo, as trustee. It also appears that Delta Funding provided the mortgage loans, Countrywide provided servicing the loans and Wells Fargo provided the financing or money. Finally, it appears from sections 2.04(b), 2.05, 3.08, 7.01 and 9.05 of the PSA that there was an agreement on the fees each party could collect as well as their liability for losses. (Pl.['s] Resp. Ex. K.) Moreover, in section 4 of the expert report by Kevin P. Byers, Mr. Byers notes that Delta Funding's revenues result primarily from "the sale of mortgage loans (through securitization and on a whole loan basis and sale of its servicing right on newly originated or purchased pools of home-equity loans.") (Pl.['s] Resp. Ex. A at 8–9 (quoting Delta Funding's 10–K annual report to the Security and Exchange Commission).) Therefore, taking the evidence in the light most favorable to the plaintiff, it would not be unreasonable for a jury to conclude that Delta Funding, Countrywide and Wells Fargo entered into a joint venture. As there is a genuine issue of material fact, the Court denies summary judgment.

■ Turning to the agency issue, Fleming testified that she represented Delta Funding (Fleming Dep. at 50.) Legg testified that Tri–State received loan packets with instructions from the lenders.

(Legg Dep. at 31–32, 87–89.) Taking Fleming's admission in the light most favorable to the plaintiff, it would not be unreasonable for a jury to conclude that Tri–State, Fleming and Legg were agents of Delta Funding. Moreover, as each venturer is liable for the acts of its co-venturer, it would not be unreasonable for a jury to conclude that Wells Fargo and Countrywide are liable to the plaintiff for the actions of Tri–State, Fleming and Legg, as agents of Delta Funding. As there are genuine issues of material fact concerning this claim, the Court denies summary judgment.

## IV

On the basis of the foregoing, it is hereby **ORDERED** that defendants' motion for summary judgment with regard to Wells Fargo is **DENIED** on Counts I, II and VIII of the amended complaint and that defendants' motion for summary judgment with regard to Countrywide is **GRANTED** on Counts I and II of the amended complaint and is **DENIED** on Count VIII. of the amended complaint.