511 S.E.2d 854

**Orville ARNOLD and Maxine Arnold Plaintiffs,**

v.

**UNITED COMPANIES LENDING CORPORATION, a corporation, and Michael T. Searls, an individual, Defendants.**

No. 25053.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 16, 1998.

Decided Dec. 11, 1998.

Daniel F. Hedges, Esq., Mountain State Justice, Inc., Charleston, West Virginia, Attorney for Plaintiffs.

W. Michael Moore, Esq., Rita Massie Biser, Esq., Kay, Casto, Chaney, Love & Wise, Charleston, West Virginia, Attorneys for Defendant United Companies Lending Corporation.

McCUSKEY, Justice:

This Court is presented with three certified questions from the Circuit Court of Lincoln County. In the action before the circuit court, the plaintiffs, Orville Arnold and Maxine Arnold, seek declaratory and other relief against the defendants, United Companies Lending Corporation (hereinafter "United Lending") and Michael Searls. The Arnolds contend that an arbitration agreement, which they signed as part of a loan transaction, is void and unenforceable on several grounds. The relevant issues concern the validity of an arbitration agreement in the context of a consumer loan and the duties of loan brokers to prospective borrowers. Specifically, the certified questions state:

1. Whether a circuit court, upon being presented with a consumer credit contract requiring compulsory arbitration, should bifurcate the proceedings or otherwise make an initial determination as to the validity of the compulsory arbitration clause prior to proceeding with the remainder of the underlying substantive issues in the case.

2. Whether this compulsory arbitration clause in the context of a form document signed by a consumer in a consumer credit context which contains substantial waiver of substantive rights while preserving to the creditor a judicial forum is so one-sided as to be void as a matter of law.

3. Whether a loan broker owes a fiduciary duty to prospective borrowers (a) to provide a written agreement describing the services and agreements between them, (b) to give them an opportunity to consider and cancel the agreement, (c) to inform them of the cost of the broker's services, (d) to disclose the loan options and risks available to them, and (e) to act as an agent of the borrower and not of the lender.

The circuit court answered each of these questions in the affirmative.

I.

*Factual and Procedural Background*

On September 17, 1996, Michael Searls came to the residence of Orville and Maxine Arnold, an elderly couple living in Lincoln County, West Virginia. Searls offered to arrange a loan for the Arnolds, acting as a loan broker. At the conclusion of this encounter, the Arnolds paid Searls $50.00 to begin processing their loan.[1]

Thereafter, Searls procured a loan for the Arnolds from United Lending, and on October 18, 1996, the loan closing occurred. Out of the loan proceeds, a mortgage broker fee of $940.00 was paid to Searls and/or Accent Financial Services, with which Searls is affiliated.

At the loan closing, United Lending had the benefit of legal counsel, while the Arnolds apparently did not. During the course of the transaction, the Arnolds were presented with more than twenty-five documents to sign. Among these documents were a promissory note, reflecting a principal sum of $19,300.00 and a yearly interest rate of 12.990%; a Deed of Trust, giving United Lending a security interest in the Arnolds' real estate; and a two-page form labeled "Acknowledgment and Agreement to Mediate or Arbitrate." It is this arbitration agreement that is at the center of the parties' dispute.

The arbitration agreement stated, in ordinary type, that "all ... legal controversies

---

1. A "Service Contract Agreement," dated September 17, 1996, and attached to the Amended Complaint, contains handwritten markings which substantiate the fact that Searls received a $50.00 "application fee" from the Arnolds.

[that are not resolved by mediation] ... relating to the extension of credit (the 'Loan') by Lender to Borrower ... including ... the validity and construction of this arbitration provision shall be resolved solely and exclusively by arbitration." "In addition, the agreement conspicuously stated in all capital letters:

THE ARBITRATION WILL TAKE THE PLACE OF ANY COURT PROCEEDING INCLUDING A TRIAL BEFORE A JUDGE AND JURY DAMAGES SHALL BE LIMITED TO ACTUAL AND DIRECT DAMAGES AND SHALL IN NO EVENT INCLUDE CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR TREBLE DAMAGES AS TO WHICH BORROWER AND LENDER EXPRESSLY WAIVE ANY RIGHT TO CLAIM TO THE FULLEST EXTENT PERMITTED BY LAW.

Returning to regular type, the agreement continued: "The award rendered by the arbitration shall be final, nonappealable and judgment may be entered upon it ... in any court having jurisdiction," and the "arbitration proceedings are confidential." However, application of the agreement was expressly limited by the following language:

[T]his Agreement to ... arbitrate shall not apply with respect to either (i) the Lender's right ... to submit and to pursue in a court of law any actions related to the collection of the debt; (ii) foreclosure proceedings ..., proceedings pursuant to which Lender seeks a deficiency judgment, or any comparable procedures allowed under applicable law pursuant to which a lien holder may acquire title to the Property which is security for this loan and any related personal property ... upon a default by the Borrower under the mortgage loan documents; or (iii) an application by or on behalf of the Borrower for relief under the federal bankruptcy laws of [sic] any other similar laws of general application for the relief of debtors .... [2]

Sometime between January and May of 1997, the Arnolds paid off their loan from United Lending. Although this Court is cognizant of the seeming inconsistency between the Arnolds' repayment of that loan and their maintenance of a lawsuit against United Lending, this matter is before us upon only a limited record for the resolution of certified questions. Thus, we must presume, despite the fact that the loan has been repaid, that some controversy remains before the circuit court.

On July 10, 1997, the Arnolds filed suit against United Lending and Searls, seeking, *inter alia*, a declaratory judgment adjudging the arbitration agreement to be void and unenforceable. On August 11, 1997, United Lending moved to dismiss the entire action, with prejudice, on the basis of the compulsory arbitration agreement. On September 19, 1997, United Lending filed a notice of withdrawal of its motion to dismiss. On or about September 22, 1997, the Arnolds moved for partial summary judgment against United Lending, seeking a declaratory judgment that the "arbitration clause" is void and unenforceable. As result of United Lending's motion to dismiss and the Arnolds' motion for partial summary judgment, the circuit court certified the above questions to this Court. *See W. Va. Code* § 58–5–2 (1998).

## II.

### Standard of Review

■ In Syllabus Point 1 of *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996), this Court held: "The appellate standard of review of questions of law answered and certified by a circuit court is *de novo*." Accord *King v. Lens Creek Ltd. Partnership*, 199 W.Va. 136, 140, 483 S.E.2d 265, 269 (1996).

## III.

### Discussion

### A.

### Certified Question One

■ Certified question one, as formulated by the circuit court, presents the following query:

---

**2.** Virtually this same language was set forth in paragraph 26 of the Deed of Trust, which the record indicates was signed by the Arnolds at the loan closing.

Whether a circuit court, upon being presented with a consumer credit contract requiring compulsory arbitration, should bifurcate the proceedings or otherwise make an initial determination as to the validity of the compulsory arbitration clause prior to proceeding with the remainder of the underlying substantive issues in the case.

After careful review and deliberation, this Court concludes that certified question one, as formulated by the circuit court, is unnecessary to the decision of this case. To the extent that certified question one involves the issue of the validity of the arbitration agreement, that issue is fully addressed by certified question two, which we answer below. " 'In a certified case, this Court will not consider certified questions not necessary to a decision of the case.' Syllabus Point 6, *West Virginia Water Serv. Co. v. Cunningham*, 143 W.Va. 1, 98 S.E.2d 891 (1957), Syllabus Point 7, *Shell v. Metropolitan Life Ins. Co.*, 181 W.Va. 16, 380 S.E.2d 183 (1989)." Syl. pt. 5, *Anderson v. Moulder*, 183 W.Va. 77, 394 S.E.2d 61 (1990). Therefore, we dispense with certified question one without further discussion.

### B.

#### Certified Question Two

■ In considering certified question two, this Court finds it necessary to reframe the issue, at the outset, so that we can fully address the law that is involved.[3] We reformulate the question as follows:

Whether an arbitration agreement entered into as part of a consumer loan transaction containing a substantial waiver of the consumer's rights, including access to the courts, while preserving for all practical

purposes the lender's right to a judicial forum, is void as a matter of law.

The Arnolds argue that the arbitration agreement is void as a matter of law on the grounds that it is (1) unconscionable, (2) a contract of adhesion, and (3) contravenes public policy. For its counterargument, United Lending avers, in essence, that the waiver and reservation of rights which the agreement purports to effect are lawful and do not render the agreement unconscionable nor legally void.[4]

"Unconscionability" is a general contract law principle, based in equity,[5] which is deeply ingrained in both the statutory and decisional law of West Virginia. Of particular importance to this case are the provisions contained in the West Virginia Consumer Credit and Protection Act, *W. Va.Code § 46A–1–101 et seq.* (hereinafter "CCPA"), which were specifically designed to eradicate unconscionability in consumer transactions. *W. Va.Code § 46A–2–121* (1996) of the CCPA provides, in relevant part:

(1) With respect to a transaction which is or gives rise to a consumer credit sale, consumer lease or consumer loan, if the court as a matter of law finds:

(a) The agreement or transaction to have been unconscionable at the time it was made, or to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or

(b) Any term or part of the agreement or transaction to have been unconscionable at the time it was made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement without the unconscionable term or part, or may so limit the application of any unconscionable

---

3. This Court's authority to modify a certified question was addressed in Syllabus Point 3 *of Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1963):

When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under both the Uniform Certification of Questions of Law Act found in *W.Va.Code, 51–1A–1, et. seq.*

4. Both parties raise the issue of whether the arbitration agreement is governed by the Federal Arbitration Act, 9 U.S.C. § *et. seq.* Resolution of that issue is not necessary in the matter before us.

5. As stated in Syllabus Point 1 of *Troy Mining Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749 (1986), "[u]nconscionability is an equitable principle, and the determination of whether a contract or a provision therein is unconscionable should be made by the court."

term or part as to avoid any unconscionable result.

The Arnolds invoke the CCPA, asserting that the arbitration agreement is unconscionable, in violation of *W. Va.Code* § 46A–2–121(1)(b), because it is manifestly unfair to consumers. The inequity, say the Arnolds, emanates from the terms of the agreement, which bind the consumer to relinquish his or her right to a day in court and virtually all substantive rights, while the lender retains the right to a judicial forum for purposes of collection and foreclosure proceedings, deficiency judgments, and all other procedures which the lender may pursue to acquire title to the borrower's real or personal property. For the reasons set forth below, we agree.

■ " 'The legislature in enacting the West Virginia Consumer Credit and Protection Act, W.Va.Code, 46A–1–101, *et seq.*, in 1974, sought to eliminate the practice of including unconscionable terms in consumer agreements covered by the Act. To further this purpose the legislature, by the express language of W.Va.Code, 46A–5–101(1), created a cause of action for consumers and imposed civil liability on creditors who include unconscionable terms that violate W.Va. Code, 46A–2–121 in consumer agreements.' Syl. pt. 2, *U.S. Life Credit Corp. v. Wilson*, 171 W.Va. 538, 301 S.E.2d 169 (1982)." Syl. pt. 1, *Orlando v. Finance One of West Virginia, Inc.*, 179 W.Va. 447, 369 S.E.2d 882 (1988). Although the CCPA contains no definition of "unconscionable," this Court has previously looked to the definition furnished by the drafters of the Uniform Consumer Credit Code, which contains provisions concerning unconscionability that are identical to *W. Va.Code* § 46A–2–121(1)(a), (b) (1996):

The drafters of the Uniform Consumer Credit Code explained that the principle of unconscionability "is one of the prevention of oppression and unfair surprise and not the disturbance of reasonable allocation of risks or reasonable advantage because of superior bargaining power or position." *See* Uniform Consumer Credit Code, § 5.108 comment 3, 7A U.L.A. 170 (1974). The drafters stated:

The basic test is whether, in the light of the background and setting of the market, the needs of the particular trade or case, and the condition of the particular parties to the conduct or contract, the conduct involved is, or the contract or clauses involved are so one sided as to be unconscionable under the circumstances existing at the time the conduct occurs or is threatened or at the time of the making of the contract.

Id. The drafters explained further that "[t]he particular facts involved in each case are of utmost importance since certain conduct, contracts or contractual provisions may be unconscionable in some situations but not in others." Id.

*Orlando*, 179 W.Va. at 450, 369 S.E.2d at 885.

The parameters of the defense of unconscionability are further illuminated by this passage from *Troy Mining Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749 (1986), where this Court quoted the Restatement (Second) of Contracts:

A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in allocation of risks to the weaker party. But gross inadequacy in bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion or may show that the weaker party had no meaningful, no real alternative, or did not in fact assent or appear to assent to the unfair terms.

*Id.* at 604, 346 S.E.2d at 753 (emphasis omitted).

Moreover, in Syllabus Point 3 of *Board of Educ. of Berkeley County v. W. Harley Miller, Inc.*, 160 W.Va. 473, 236 S.E.2d 439 (1977), this Court stated:

[W]here a party alleges that the arbitration provision was unconscionable, or was thrust upon him because he was unwary and taken advantage of, or that the contract was one of adhesion, the question of whether an arbitration provision was bargained for and valid is a matter of law for the court to determine by reference to the entire contract, the nature of the contract-

ing parties, and the nature of the undertakings covered by the contract.

Syl. pt. 1, *Art's Flower Shop, Inc. v. Chesapeake and Potomac Tel. Co.*, 186 W.Va. 613, 413 S.E.2d 670 (1991) ("limitation of liability" clause held void for unconscionability).

■ Based on these precepts, this Court held in Syllabus Point 4 *of Art's Flower Shop, supra*, that "[a] determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and 'the existence of unfair terms in the contract.'"

Applying the rule announced in *Art's Flower Shop, supra*, leads us to the inescapable conclusion that the arbitration agreement between the Arnolds and United Lending is "void for unconscionability" as a matter of law.[6] *See id.* at 618, 413 S.E.2d at 675. Indeed, the kind of agreement here at issue was aptly caricatured by this Court in *Miller, supra*, as "the contract between the rabbits and foxes." The *Miller* Court stated:

> In real life we can envisage arbitration provisions being imposed upon consumers in contract situations where consumers are totally ignorant of the implications of what they are signing, and where consumers bargain away many of the protections which have been secured for them with such difficulty at common law.

160 W.Va. at 486, 236 S.E.2d at 447. The scenario envisioned in *Miller* is now before us. The relative positions of the parties, a national corporate lender on one side and elderly, unsophisticated consumers[7] on the other, were "grossly unequal." *See Art's Flower Shop*, 186 W.Va. at 618, 413 S.E.2d at 675. In addition, there is no evidence that the loan broker made any other loan option available to the Arnolds. In fact, the record does not indicate that the Arnolds were seeking a loan, but rather were solicited by defendant Searls. Thus, the element of "a comparable, meaningful alternative" to the loan from United Lending is lacking. *See id.* Because the Arnolds had no meaningful alternative to obtaining the loan from United Lending, and also did not have the benefit of legal counsel during the transaction, their bargaining position was clearly inadequate when compared to that of United Lending.

Given the nature of this arbitration agreement, combined with the great disparity in bargaining power, one can safely infer that the terms were not bargained for and that allowing such a one-sided agreement to stand would unfairly defeat the Arnolds' legitimate expectations.

Finally, the terms of the agreement are "unreasonably favorable" to United Lending. *Id.* United Lending's acts or omissions could seriously damage the Arnolds, yet the Arnolds' only recourse would be to submit the matter to binding arbitration. At the same time, United Lending's access to the courts is wholly preserved in every conceivable situation where United Lending would want to secure judicial relief against the Arnolds. Like the "rabbits and foxes situation," discussed in *Miller, supra*, the wholesale waiver of the Arnolds' rights together with the com-

---

**6.** We want to dispel the notion, which appears to have arisen in this case, that there are two distinct issues termed "procedural unconscionability" and "substantive unconscionability," either one of which can invalidate a contract. This Court addressed the same misperception in *Troy Mining Corp., supra*, stating:

> V & R also argues on appeal that the circumstances in which the 1979 contract were executed raise a separate issue of "procedural unconscionability," or overall unconscionability based on unfairness or inequities in the bargaining process .... [W]e do not see it as an entirely separate "second bite" at the unconscionability apple. Whether a particular term in a contract is unconscionable often depends on the circumstances in which the contract was executed or the fairness of the contract as a whole, and therefore our analysis

necessarily includes an inquiry beyond the face of the contract .... [T]he question of "procedural unconscionability" is an essential part of any determination of whether a particular clause or contract is unconscionable. A finding that the transaction was flawed, however, still depends on the existence of unfair terms in the contract. A litigant who complains that he was forced to enter into a fair agreement will find no relief on grounds of unconscionability.

176 W.Va. at 603–04, 346 S.E.2d at 753.

**7.** According to the pleadings, Mr. Arnold is 69 years old with a fifth grade education, and Mrs. Arnold is 63 years old with an eighth grade education.

plete preservation of United Lending's rights "is inherently inequitable and unconscionable because in a way it nullifies all the other provisions of the contract." 160 W.Va. at 480, 236 S.E.2d at 443.

■ Accordingly, under the circumstances of this action, we hold that where an arbitration agreement entered into as part of a consumer loan transaction contains a substantial waiver of the borrower's rights, including access to the courts, while preserving the lender's right to a judicial forum, the agreement is unconscionable and, therefore, void and unenforceable as a matter of law.

### C.

### Certified Question Three

■ The third and final question certified to this Court concerns the legal duties of loan brokers relative to prospective borrowers. As set forth previously, the third certified question submitted by the circuit court is as follows:

> Whether a loan broker owes a fiduciary duty to prospective borrowers (a) to provide a written agreement describing the services and agreements between them, (b) to give them an opportunity to consider and cancel the agreement, (c) to inform them of the cost of the broker's services, (d) to disclose the loan options and risks available to them, and (e) to act as an agent of the borrower and not of the lender.

Because the form of this question does not lend itself to a complete analysis of the legal issues involved, we utilize our power to reformulate certified questions.[8] As reframed, certified question three presents these issues:

> Whether a loan broker owes a duty to prospective borrowers: (a) to provide a written contract containing a description of the services to be performed, (b) to give them an opportunity to consider and cancel the agreement, (c) to inform them of the cost of the broker's services, and (d) to disclose the loan options and risks available to them.
>
> Whether a loan broker acts as an agent of prospective borrowers.

■ Both the Arnolds and United Lending recognize that the Legislature has imposed certain duties upon a loan broker in relation to prospective borrowers. Indeed, the West Virginia Consumer Credit and Protection Act contains an entire article pertaining to "credit services organizations," and as defined in that article, the term "credit services organizations" includes loan brokers.[9] *See W. Va.Code* § 46A–6C–1 *et seq.* (1991). Pursuant to *W. Va.Code* § 46A–6C–6 (1991), before executing a contract with a buyer,[10] or receiving money or other valuable consideration, a credit services organization must furnish the buyer with a written statement containing "[a] complete and detailed description of the services to be performed by the credit services organization for the buyer and the total cost of the services." *W. Va. Code* § 46A–6C–6(a)(1) (1991). Moreover, *W. Va.Code* § 46A–6C–7 (1991)[11] mandates a

---

**8.** *See* footnote 3, *supra.*

**9.** A "credit services organization" is defined, in relevant part, as "a person who, with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, ... provides, or represents that the person can or will provide, any of the following services: ... (2) Obtaining an extension of credit for a buyer." *W. Va.Code* § 46A–6C–2 (1991).

**10.** The term "buyer" is defined in Article 6C as "an individual who is solicited to purchase or who purchases the services of a credit services organization." *W. Va.Code* § 46A–6C–1 (1991). We find that this definition includes "prospective borrowers."

**11.** *W. Va.Code* § 46A–6C–7 (1991) provides:

(a) Each contract between the buyer and a credit services organization for the purchase of the services of the credit services organization must be in writing, dated, signed by the buyer, and must include:

(1) A statement in type that is boldfaced, capitalized, underlined, or otherwise set out from surrounding written materials so as to be conspicuous, in immediate proximity to the space reserved for the signature of the buyer, as follows: "You, the buyer, may cancel this contract at any time before midnight of the third day after the date of the transaction. See the attached notice of cancellation form for an explanation of this right";

(2) The terms and conditions of payment, including the total of all payments to be made by the buyer, whether to the credit services organization or to another person;

written contract for the services of a credit services organization and prescribes the contractual form and terms, including a conspicuous statement informing the consumer of his or her right to cancel the contract for up to three days after the date of the transaction. *See W. Va.Code* § 46A-6C-7(a)(1) (1991). The contract must also contain "[a] full and detailed description of the services to be performed" and "[t]he terms and conditions of payment, including the total of all payments to be made by the buyer, whether to the credit services organization or to another person." *W. Va.Code* § 46A-6C-7(a)(2)-(3) (1991).

■ In Syllabus Point 3, in part, of *West Virginia Health Care Cost Review Auth. v. Boone Mem. Hosp.*, 196 W.Va. 326, 472 S.E.2d 411 (1996), this Court held: "If the language of an enactment is clear and within the constitutional authority of the lawmaking body which passed it, courts must read the relevant law according to its unvarnished meaning, without any judicial embroidery."[12]

■ The duties referenced in subparts (a), (b), and (c) of the certified question, as reframed by this Court, are clearly delineated by the foregoing statutory provisions. The constitutional authority of the Legislature in enacting these statutes is not in dispute. It is, therefore, incumbent upon this Court to read the relevant statutory language according to its "unvarnished mean-ing." Thus, we find that *W. Va.Code* § 46A-6C1 *et seq.* (1991) imposes various duties upon a loan broker in his or her dealings with prospective borrowers, including the duty to provide a written contract which meets the contractual requirements set forth in *W. Va.Code* § 46A-6C-7 (1991). Pursuant to *W. Va.Code* § 46A-6C-7 (1991), such a contract must contain, among other things, a full and detailed description of the services to be performed, a conspicuous statement informing the borrower of his or her right to cancel the contract for up to three days after the date of the transaction, and the terms and conditions of payment, including the total of all payments to be made by the borrower, whether to the loan broker or to another person. Thus, we answer subparts (a), (b), and (c) of the certified question in the affirmative.

■ Subpart (d) of certified question three, as modified, presents an issue not addressed by statutory law: Does a loan broker owe a duty to prospective borrowers to disclose the loan options and risks available to them? The answer to this question turns upon whether the loan broker is acting as a true "broker" or merely as a "middleman" with respect to the subject transaction, a distinction that is well established under the common law. The determination of this issue requires a thorough examination of the

---

(3) A full and detailed description of the services to be performed by the credit services organization for the buyer, including all guarantees and all promises of full or partial refunds, and the estimated length of time, not to exceed one hundred eighty days, for performing the services; and

(4) The address of the credit services organization's principal place of business and the name and address of its agent in the state authorized to receive service or process.

(b) The contract must have attached two easily detachable copies of a notice of cancellation. The notice must be in boldfaced type and in the following form:

"Notice of Cancellation

You may cancel this contract, without any penalty or obligation, within three days after the date the contract is signed.

If you cancel, any payment made by you under this contract will be returned within ten days after the date of receipt by the seller of your cancellation notice.

To cancel this contract, mail or deliver a signed dated copy of this cancellation notice, or other written notice to: (name of seller) at (address of seller) (place of business) not later than midnight (date)

I hereby cancel this transaction.

(date)

(purchaser's signature)"

(c) The credit services organization shall give to the buyer a copy of the completed contract and all other documents the credit services organization requires the buyer to sign at the time they are signed.

**12.** *See also State ex rel. Riffle v. Ranson*, 195 W.Va. 121, 126, 464 S.E.2d 763, 768 (1995) ("Once the Legislature indicates its preference by the enactment of a statute, the Court's role is limited. Our duty is to interpret the statute, not to expand or enlarge upon it."); *State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 24, 454 S.E.2d 65, 69 (1994) ("Courts are not free to read into the language what is not there, but rather should apply the statute as written.").

pertinent facts. Ultimately, if a loan broker is acting as a "broker" in the strictest sense, the duty of disclosure exists. But if a loan broker acts as a mere "middleman," the law imposes no duty of disclosure. Having given this short answer to subpart (d) of the certified question, we now proceed to discuss more fully the legal principles involved.

The term "broker" has been variously defined. In *Moore v. Turner*, 137 W.Va. 299, 71 S.E.2d 342 (1952), this Court recited the following definitions of a "broker:"

"A broker is one who is engaged for others, on a commission, in negotiating contracts relative to property with the custody of which he has no concern; * * *." 12 C.J.S., Brokers, Section 1. "Every person whose business it is to negotiate purchases and sales of property with the custody of which he has no concern, neither with the original possession nor the delivery, is a broker." *Lawrence Gas Company v. Hawkeye Oil Company*, 182 Iowa 179, 165 N.W. 445, 8 A.L.R. 192. "A broker is a fiduciary required to exercise fidelity and good faith toward his principal in all matters within the scope of his employment." 8 Am.Jur., Brokers, Section 86. Some additional definitions of a broker are: "A person employed to sell property for another * * *." *Abraham v. Wasaff*, 111 Okla. 165, 239 P. 138; a person "whose business it is to bring buyer and seller together." *Keys v. Johnson*, 68 Pa. 42; and " * * * a middleman whose business it is to bring seller and buyer together." *Ryan v. Walker*, 35 Cal.App. 116, 169 P. 417.

*Id.* at 31, 71 S.E.2d at 349–50.

Significantly, this Court noted in *Moore* that "there is a well defined distinction between a middleman and a broker," and " 'a middleman is not subject to the rules governing brokers.' " *Id.* at 312–13, 71 S.E.2d at 350. This Court described " ' "a broker employed as a mere middleman," ' " as " ' "one engaged not to negotiate a sale or purchase, but simply to bring two parties together and permit them to make their own bargain." ' " *Id.* at 314, 71 S.E.2d at 350. Expounding upon the distinction between a "broker" from a "middleman," we stated:

" 'A broker is simply a middleman ... when he has no duty to perform but to bring the parties together, *leaving them to negotiate and come to an agreement themselves without any aid from him.* If he *takes,* or contracts to take, any part in the negotiations, however, he cannot be regarded a mere middleman, no matter how slight a part it may be.' "

*Id.* at 314, 71 S.E.2d at 350 (emphasis in original).

Having distinguished a mere middleman from a true broker, this Court articulated a rule in Syllabus Point 2 of *Moore, supra,* imposing a duty of disclosure on brokers:

A broker must act with the utmost good faith towards his principal and is under a legal obligation to disclose to his principal all facts within his knowledge which are or may be material to the transaction in which he is employed or which might influence the action of his principal in relation to such transaction.

Since a middleman is not bound by the rules governing brokers, it follows that this duty of disclosure applies only where a true broker, and not just a middleman, is involved. Applying these principles to the facts of the instant case, we find that where a loan broker acts as a true broker, and not a mere middleman, the broker is under a legal obligation (*i.e.,* a duty) to disclose to the prospective borrowers all facts within his knowledge which are or may be material to the transaction for which he is employed or which might influence their action in relation to such transaction.

The final issue confronting this Court, as part of certified question three, is whether a loan broker acts as an agent of prospective borrowers. Like the duty of disclosure, the answer to this question is fact dependent; one must examine the facts of a particular case to determine whether an agency relationship exists. But " '[p]roof of an express contract of agency is not essential to the establishment of the relation. It may be inferred from facts and circumstances, including conduct.' " *General Elec. Credit Corp. v. Fields*, 148 W.Va. 176, 181, 133 S.E.2d 780, 783 (1963). In Syllabus Point 2

of *Thomson v. McGinnis*, 195 W.Va. 465, 465 S.E.2d 922 (1995), this Court stated:

> "One of the essential elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent." Syl. Pt. 3, Teter v. Old Colony Co., 190 W.Va. 711, 441 S.E.2d 728 (1994).

*See Peters v. Riley*, 73 W.Va. 785, 791, 81 S.E. 530, 532 (1914) (no agency found where "[a]ll the essential elements of the contract remained in the sole and exclusive control of the defendant"); *see also Wright & Souza, Inc. v. DM Properties*, 1 Neb.App. 822, 510 N.W.2d 413 (1993) (prospective borrower failed to establish that loan broker acted as borrower's agent where borrower had no control over broker). This Court further stated in *Thomson* that a principal denying agency must show that the principal neither controlled, nor had the right to control, the work, and "where factual conflict exists regarding the degree of control exercised and the nature of the relationship thereby created, jury resolution is warranted." 195 W.Va. at 470, 465 S.E.2d at 927. Thus, in answer to the last part of certified question three, we emphasize that the existence of an agency relationship between a loan broker and prospective borrowers is fact dependent, and absent proof that the borrowers had the right to, or did, exert some degree of control over the conduct of the broker, no agency can be found to exist.

Certified Questions Answered.

Chief Justice DAVIS and Justices WORKMAN, STARCHER, and MAYNARD joined in the Opinion of the Court.

Justice McGRAW did not participate in the decision of this case.