# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 10, 2014 Session

## DARRELL TRIGG v. LITTLE SIX CORPORATION ET AL.

**Interlocutory Appeal from the Circuit Court for Hawkins County**
**No. 13CV0094     Thomas J. Wright, Judge**

_____

**No. E2013-01929-COA-R9-CV-FILED-JULY 28, 2014**

_____

The issue in this wrongful termination action is the enforceability of an arbitration clause in an agreement between the plaintiff employee and his former employer. Plaintiff executed an employment agreement in 2007. Employer terminated plaintiff without cause in April 2012. He brought this action alleging common law retaliatory discharge and violations of the Tennessee Public Protection Act and the Tennessee Human Rights Act. Employer filed a motion to compel arbitration. Plaintiff argued that the arbitration clause is unenforceable because it is unconscionable due to the "excessive" and "prohibitive" costs of arbitration. The trial court found that the agreement had been freely negotiated and was neither a contract of adhesion nor unconscionable. We affirm the judgment of the trial court enforcing the agreement and ordering arbitration.

**Tenn. R. App. P. 9 Interlocutory Appeal by Permission; Judgment of the Circuit Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Robert L. Arrington, Andrew T. Wampler, and Sarah B. Ellsworth, Kingsport, Tennessee, for the appellant, Darrell Trigg.

W. Challen Walling and Wade W. Massie, Bristol, Tennessee, for the appellees, Little Six Corporation dba Short Mountain Silica, J.D. Nicewonder, R.L. Wallen, and David Lester.

# OPINION

## I.

Plaintiff was employed by defendant Little Six Corporation as the general manager and chief engineer at its Short Mountain Silica facility, an industrial sand mining and production facility in Mooresburg. He began his employment in 1987. He testified that "[a]t one time, I held equity in Short Mountain Silica and its sister corporation Short Mountain Trucking" and that he had been promised he would eventually own a 10% equity position in both corporations. In 2007, plaintiff and his employer began negotiating a new employment agreement; according to plaintiff,

> in 2007, corporate management presented me with an Employment Agreement that changed the relationship. I played no part in drafting the Employment Agreement, which provided for the buy-out of my shares and for my continuing as General Manager at an annual salary.

With respect to the employment agreement, Plaintiff dealt with David Lester, the Secretary and Treasurer of Little Six Corporation. Lester testified in his affidavit as follows:

> [Plaintiff] was the one who initiated the Agreement, not Short Mountain. [Plaintiff] wanted cash at that time for any interest he had in the company.
>
> . . . In fact, [plaintiff] suggested terms for the Agreement before it was drafted, and he reviewed and revised the drafts of the Agreement before signing it.

As exhibits to his affidavit, Lester attached examples of correspondence, both email and handwritten, where plaintiff proposed terms, and suggested and negotiated changes, to the draft agreement.

The parties executed the employment agreement on August 27, 2007. The agreement provided that plaintiff's earlier employment agreement would be terminated, and that Little Six Corporation would pay plaintiff $1,578,599 in full settlement of any and all claims plaintiff might have under his previous agreement, including any claim to an equity interest in the employer's corporations. The new agreement provided that plaintiff would continue to work in his same position at the same annual salary of $154,472. The agreement

addressed other employment benefits such as health insurance and a company car, and further stated, in relevant part, as follows:

> [T]he employment relationship between Trigg and Little Six shall be strictly at will basis. As a result, either party may terminate the relationship by giving one (1) month's written notice to the other, at its or his sole discretion, without cause or reason. In the event Little Six is the party giving such notice, . . . Trigg shall be entitled to receive a payment of Fifty Thousand Dollars ($50,000) only. In the event Little Six terminates Trigg's employment for cause, Trigg shall be entitled to receive one (1) additional month's salary only.

> \* \* \*

> **Voluntary and Knowing Action**. Trigg represents and agrees: (a) that he has had the opportunity to review this Agreement with his own legal counsel; (b) that he has thoroughly read and understands the terms of this Agreement, (c) that he has no mental or physical condition that would impair his ability to understand the terms of this Agreement, (d) that he is knowingly and voluntarily entering into this Agreement; . . .

> **Opportunity to Consider and Consult Counsel.** TRIGG, BY EXECUTING THIS AGREEMENT, EXPRESSLY ACKNOWLEDGES AND AGREES THAT HE HAS HAD THE FULL AND REASONABLE OPPORTUNITY TO READ AND CONSIDER THIS AGREEMENT AND WHETHER OR NOT HE DESIRES TO ENTER INTO IT. TRIGG ALSO ACKNOWLEDGES AND AGREES THAT HE HAS HAD THE OPPORTUNITY TO CONSULT WITH AND HAS BEEN ADVISED BY INDEPENDENT LEGAL COUNSEL OF HIS OWN CHOICE CONCERNING THIS AGREEMENT. BY EXECUTION OF THIS AGREEMENT, TRIGG ACKNOWLEDGES RECEIPT OF A COPY OF THIS AGREEMENT FOR HIS CONSIDERATION AND REVIEW AND THAT HE HAS BEEN GIVEN UP TO TWENTY-ONE (21) DAYS TO CONSIDER AND REVIEW IT IF HE SO CHOOSES. TRIGG AGREES THAT HE WAS NOT COERCED, THREATENED OR OTHERWISE FORCED TO

-3-

SIGN THIS AGREEMENT. TRIGG AGREES HE MADE THE CHOICE TO SIGN IT VOLUNTARILY AND OF HIS OWN FREE WILL.

**Notice of Right to Revoke**. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, TRIGG SHALL HAVE THE RIGHT TO REVOKE THIS AGREEMENT WITHIN AT LEAST SEVEN (7) DAYS AFTER SIGNING IT. . . .

**Agreement Product of Mutual Effort.** Trigg and Little Six acknowledge and agree that this Agreement is the product of the mutual negotiations and efforts of the parties, both of whom have been and are represented by independent counsel of their own choosing. Accordingly, this Agreement shall not be interpreted or construed as if one party was its drafter or preparer.

(Section numbering omitted; underlining, bold font, and capitalization in original.)

Little Six terminated plaintiff's employment effective April 30, 2012. Acknowledging that the termination was without cause, Little Six paid plaintiff $50,000 pursuant to the employment agreement. On March 28, 2013, plaintiff filed this action alleging unlawful discrimination based on his age – he was 53 at the time – and his religious beliefs, as reflected in his "Christian lifestyle." Plaintiff also alleged that his employer unlawfully retaliated against him for reporting potential violations of state and federal environmental regulations. The complaint alleges claims for common law retaliatory discharge; violation of the Tennessee Public Protection Act, also known as the "Whistleblower Act," Tenn. Code Ann. § 50-1-304 (2008 & Supp. 2013); and violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-301 (2011).

Defendants filed a motion to dismiss or to stay and compel arbitration, invoking the arbitration clause of the employment agreement, which provides in its entirety as follows:

**Arbitration**. Any dispute, controversy, or claim arising out of, in connection, or relating to this Agreement, or any breach or alleged breach hereof, which cannot be settled or resolved by mutual agreement, shall be submitted to and resolved by arbitration which shall be conducted before a three (3) member panel in conformance with the rules of the American Arbitration

Association then in effect for commercial disputes. The arbitration shall be conducted in Rogersville, Tennessee or at such other place that may be mutually acceptable to the parties. The arbitration award shall be determined by majority vote of the arbitration panel, [and] will be final and binding upon the parties. The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence, and counsel.

In response, plaintiff argued that the arbitration clause is unenforceable because his costs to arbitrate under the agreement are unconscionably high in light of his then-current financial situation. Plaintiff filed a sworn statement in which he stated that he had been unable to find "an equivalent position" to his former job despite his efforts to do so. Plaintiff further stated that "I have established a private engineering practice in which my annual income is about twenty-five thousand dollars ($25,000.00). I have been forced to dip into my retirement savings to make ends meet."

After a hearing, the trial court rendered a memorandum opinion from the bench. That opinion was incorporated by reference into its judgment:

[T]he Court finds that this is not a contract of adhesion. Even without considering the outside information that was provided in the defendant's . . . reply to the plaintiff's response on this particular motion, by its very terms it indicates that it was entered into with the advice of counsel. That there was a lengthy period of time during which it was negotiated. That it was the product of the negotiations. That there was a revocation period after signatures.

And that it involved a highly paid, well educated, top level company employee dealing directly with owners of the company. It did not involve a consumer transaction. It was not a hastily entered into, take it or leave it situation where a person needed services, as most of those cases that discuss contracts of adhesion relate to. This was not a contract of adhesion. This was an arm's length transaction and whether Mr. Trigg felt like he had any options if he ended up disagreeing with them or not, I don't think makes any difference in a professional negotiated

contract of a professional such as himself in this particular instance.

The Court also finds that the cost of arbitration in this case will vary depending upon the length of the arbitration and the exact amount of the claim Mr. Trigg makes in an arbitration. But they will likely be between $10,000 and $30,000 for Mr. Trigg's portion of the arbitration expenses. In Tennessee, of course, the party is presumed to know the contents of the documents they sign. And in this case in particular involving a well paid, well educated, high level professional of a company negotiating an employment contract, and a contract relating to a buyout of an equity interest in a company, there's not any excuse for not knowing what the terms of it mean. These are the terms that you bargain for, basically, whether you really bargain for them or not.

\*       \*       \*

And in this particular case, to me, that means you're presumed to know, whether you discussed it with your attorney or looked into it yourself, what the rules would apply for a commercial claim under AAA that's referred to in your particular provision. So the idea that it's going to cost you [$]10[,000] to $30,000 just for your share of the costs of arbitration is not a shock to me because you're not just a normal employee. That's something you should have known when you signed the contract because that's what the contract refers you to. It shouldn't be a surprise. It's basically the benefit of the bargain that you made.

Plaintiff filed a motion for an interlocutory appeal pursuant to Tenn. R. App. P. 9, which the trial court granted. We subsequently granted the same.

II.

The issue on appeal is the one stated by us in our order granting interlocutory review:

Whether Plaintiff demonstrated that the financial cost of arbitration in this case would unreasonably impede his ability to vindicate his statutory rights such that the arbitration provision

-6-

contained in the employment agreement should be deemed contrary to public policy, unconscionable and unenforceable when said arbitration costs along with all other relevant factors under Tennessee law are considered.

## III.

Our review of a trial court's grant or denial of a motion to compel arbitration is governed by the same standards that apply to a bench trial. *Mitchell v. Kindred Healthcare Operating, Inc.*, 349 S.W.3d 492, 496 (Tenn. Ct. App. 2008). As we observed in *Rosenberg v. BlueCross BlueShield of Tenn., Inc.*, 219 S.W.3d 892, 903-04 (Tenn. Ct. App. 2006),

> [a]s a general rule, a court's enforcement of an arbitration provision is reviewed *de novo*. *See Cooper v. MRM Inv. Co.*, 367 F.3d 493, 497 (6th Cir. 2004). A trial court's order on a motion to compel arbitration addresses itself primarily to the application of contract law. We review such an order with no presumption of correctness on appeal. *See Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 356 (Tenn. Ct. App. 2001); *see also Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 629 (Tenn. 1999). However, to the extent that findings of fact are necessary concerning the "cost-prohibitive" nature of the arbitration sought, these findings come to us with a presumption of correctness absent a preponderance of evidence to the contrary. Tenn. R. App. P. 13(d); *T.R. Mills Contractors v. WRH Enterprises, LLC et al.*, 93 S.W.3d 861, 864 (Tenn. Ct. App. 2002).

## IV.

The agreement at issue in this case recites that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee." Neither party claims that the Federal Arbitration Act ("FAA") is applicable to this case. Consequently, this action is governed by the Tennessee Uniform Arbitration Act ("TUAA"), Tenn. Code Ann. §§ 29-5-301 to -320 (2012), and not the FAA. As the Tennessee Supreme Court has observed, the issue of whether the FAA or the TUAA governs a case is an important threshold question:

> The question of whether the contract is governed by the state or federal arbitration act is not an academic one. The resolution of

> that question generally determines whether certain issues concerning the arbitration agreement are to be decided by an arbitrator or by a court. *See **Frizzell Constr. Co. v. Gatlinburg, L.L.C.***, 9 S.W.3d 79 (Tenn. 1999). Because this arbitration agreement is to be interpreted in accordance with the Tennessee act, contract formation questions are to be decided by the court, not by an arbitrator. ***Id.*** at 85.

***Owens v. Nat'l Health Corp.***, 263 S.W.3d 876, 883 (Tenn. 2007). In this case, the question of unconscionability was properly decided by the trial court pursuant to the TUAA. ***Id.***; *see also **Hill v. NHC Healthcare/Nashville, LLC,*** No. M2005-01818-COA-R3-CV, 2008 WL 1901198 at *6 (Tenn. Ct. App. M.S., filed Apr. 30, 2008), *perm. app. granted*, Aug. 25, 2008 (noting that "[a]pplicable grounds for refusing to enforce a contract" under generally applicable state law governing contract formation "may include the defenses of laches, estoppel, waiver, fraud, duress and *unconscionability*.").[1] (Emphasis added.)

The TUAA provides, in relevant part, that "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract." Tenn. Code Ann. § 29-5-302(a). The Supreme Court has stated that "[i]n general, arbitration agreements in contracts are favored in Tennessee both by statute and existing case law." ***Benton v. Vanderbilt Univ.***, 137 S.W.3d 614, 617 (Tenn. 2004). Despite the favored status of arbitration agreements, Tennessee courts have refused to enforce such agreements when they have been found to be unconscionable. *See **Taylor v. Butler***, 142 S.W.3d 277, 287 (Tenn. 2004); ***Webb v. First Tenn. Brokerage, Inc.***, No. E2012-00934-COA-R3-CV, 2013 WL 3941782 at *18 (Tenn. Ct. App. E.S., filed June 18, 2013); ***Howell v. NHC Healthcare-Fort Sanders, Inc.***, 109 S.W.3d 731, 735 (Tenn. Ct. App. 2003); ***Raiteri v. NHC Healthcare/Knoxville, Inc.***, No. E2003-00068-COA-R3-CV, 2003 WL 23094413 at *8 (Tenn. Ct. App. E. S., filed Dec. 30, 2003). As the ***Taylor*** Court observed,

> Enforcement of a contract is generally refused on grounds of unconscionability where the "inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." An unconscionable

---

[1]Although the Supreme Court granted permission to appeal in the ***Hill*** case, it was subsequently settled and dismissed prior to oral argument before the High Court.

contract is one in which the provisions are so one-sided, in view of all the facts and circumstances, that the contracting party is denied any opportunity for meaningful choice.

142 S.W.3d at 285 (internal citations omitted); *see also **Reno v. SunTrust, Inc.***, No. E2006-01641-COA-R3-CV, 2007 WL 907256 at *6 (Tenn. Ct. App. E.S., filed Mar. 26, 2007). "[A] determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and the existence of unfair terms in the contract." ***Id.*** (quoting ***Arnold v. United Cos. Lending Corp***., 511 S.E.2d 854, 862 (W. Va. 1998)). "The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect." ***Id.*** (quoting Restatement (Second) of Contracts, § 208, cmt. a (1981)); *see also **Hill***, 2008 WL 1901198 at *17 ("the question of unconscionability requires courts to consider all the facts relating to a contract's purpose and effect as well as to the setting in which it was signed. One particular fact may not be the determinative factor; instead, it is the overall situation that must be considered.").

Generally speaking, courts apply a higher degree of scrutiny to contracts of adhesion, defined by the Supreme Court as " 'a standardized contract form offered to consumers of goods and services on essentially a "take it or leave it" basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract.' " ***Buraczynski v. Eyring***, 919 S.W.2d 314, 320 (Tenn. 1996) (quoting *Black's Law Dictionary* 40 (6th ed. 1990)). *See **Mitchell***, 349 S.W.3d at 499 ("Courts are more likely to find that contracts of adhesion are unconscionable."); ***Estate of Mooring v. Kindred Nursing Ctrs., Inc.***, No. W2007-02875-COA-R3-CV, 2009 WL 130184 at *4 (Tenn. Ct. App. W.S., filed Jan. 20, 2009).

This Court has recognized "two component parts" to an unconscionability analysis: "(1) procedural unconscionability, which is an absence of the meaningful choice on the part of one of the parties and (2) substantive unconscionability, which refers to contract terms which are unreasonably favorable to the other party." ***Philpot v. Tenn. Health Mgmt., Inc.***, 279 S.W.3d 573, 579 (Tenn. Ct. App. 2007); *see **Reagan v. Kindred Healthcare Operating, Inc.***, No. M2006-02191-COA-R3-CV, 2007 WL 4523092 at *11 (Tenn. Ct. App. W.S, filed Dec. 20, 2007). In the present case, plaintiff does not argue that there is procedural unconscionability, recognizing that (1) he was actively involved in bargaining for and negotiating the terms of the employment agreement; (2) he was aware of the arbitration clause, having read it before he signed the agreement; (3) he was given ample time to review the agreement with the benefit of legal counsel before he signed it; (4) he was given seven days to revoke the agreement after he signed it; and (5) as the trial court held, plaintiff was

a "highly paid, well educated, top level company employee dealing directly with owners of the company." The employment agreement is not a contract of adhesion. These factors weigh in favor of a finding that the agreement is not unconscionable, and a holding enforcing its terms.

Plaintiff's unconscionability argument rests on his assertion that the cost to him in arbitrating his claims is too high, and he cannot afford these costs under his current financial situation. The employment agreement provides that the arbitration "shall be conducted before a three (3) member panel in conformance with the rules of the American Arbitration Association then in effect for commercial disputes." According to the AAA's commercial arbitration rules, a copy of which was filed in the trial court, the AAA fee amount is on a sliding scale, depending on the amount of the claim. The complaint before us alleges that plaintiff is seeking damages for "past, present and future wages and benefits, front pay, back pay, incidental damages, attorneys fees, compensation for emotional distress, humiliation, mental anguish, embarrassment, pain and suffering, and other nonpecuniary damages," in addition to punitive damages, but does not include a specific ad damnum clause. Plaintiff states in his brief that "[h]is claims are estimated to total between two and six million dollars." The rules of the AAA provide that for a claim between one and five million dollars, the total AAA fees would be $11,450. For a claim between five and ten million dollars, the total fees would be $14,200. In accordance with the agreement providing that "[t]he expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence, and counsel," the parties would evenly split the AAA fees. They would also split the compensation of the three arbitrators. Neither party has taken issue with the trial court's finding that plaintiff demonstrated his share of costs to arbitrate his claim would likely be between $10,000 and $30,000.

We have addressed the main issue before us, *i.e.*, the cost of arbitration, on several occasions. In *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 362 (Tenn. Ct. App. 2001), we reversed the trial court's decision "that arbitration costs would bar an individual plaintiff access to a forum because the costs of arbitration were 'potentially prohibitive' for a small claimant." In *Pyburn*, as is the case here, "the parties agreed to utilize the Commercial Rules of the American Arbitration Association." *Id.* The *Pyburn* Court recognized the general rule that "[w]hen 'a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs.' " *Id.* at 363 (quoting *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 522, 148 L.Ed.2d 373 (2000)). Applying this rule, we concluded:

In the present case, Plaintiff has failed to meet this burden. While the initial filing fee for arbitration may indeed be higher to Plaintiff, this in and of itself is not sufficient to make utilization of the agreed upon forum impracticable in light of the fact that this cost can be fully recouped if Plaintiff is successful. Our conclusion might be different had the Agreement prohibited shifting of these costs or contained some language requiring Plaintiff to be responsible for all or a disproportionate share of the costs of arbitration, but that is not the situation here. There is no proof that the cost of arbitration in this case would be any greater than the cost of litigation in a court, notwithstanding the fact that Plaintiff's claims may be relatively small. *See, e.g.*, ***Circuit City Stores, Inc., v. Adams***, 532 U.S. 105, 121 S.Ct. 1302, 1313, 149 L.Ed.2d 234 (2001)("Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation, which often involves smaller sums of money than disputes concerning commercial contracts.").

*Id.* at 363 (footnote omitted). In explaining the rationale for this ruling, we looked to the AAA's commercial rules and stated as follows:

While an initial filing fee may have to be advanced by a plaintiff in a claim involving a small consumer transaction, Rule R-45 of the Commercial Rules allows the arbitrator to assess fees, expenses, and compensation of the arbitrator in a manner deemed appropriate by the arbitrator. A successful plaintiff, therefore, could have all of the "potentially prohibitive" costs shifted to the defendant. Rule R-45 also permits the arbitrator to award attorney's fees to a successful plaintiff who arbitrates a TCPA claim because an award of attorney's fees is authorized by law. *See* T.C.A. § 47-18-109(e)(1). The arbitrator can also assess costs as he or she sees fit for expenses of the arbitration, including the arbitrator and witnesses. Rule R-52. For all practical purposes, an award of costs, expenses, and attorneys fees are on the same footing in this case regardless of whether the parties arbitrate the claim or proceed in a court of law. Even if the Commercial Rules of the AAA specifically did not allow a successful plaintiff to recover costs, etc., these items could

> nevertheless be recovered by Plaintiff in arbitration because they are part of his statutory claim pursuant to the TCPA.

***Id.*** We have subsequently applied ***Pyburn*** to reject a plaintiff's claim of prohibitively expensive arbitration costs on several occasions. *See **Philpot***, 279 S.W.3d at 582; ***Flanary v. Carl Gregory Dodge of Johnson City, LLC***, No. E2004-00620-COA-R3-CV, 2005 WL 1277850 at *4 (Tenn. Ct. App. E.S., filed May 31, 2005); ***Chapman v. H & R Block Mortg. Corp.***, No. E2005-00082-COA-R3-CV, 2005 WL 3159774 at *8 (Tenn. Ct. App. E.S., filed Nov. 28, 2005).

One important distinction between the facts of the present case and those in ***Pyburn*** is that here, the parties agreed to evenly split the costs of arbitration, so the discretion of the arbitration panel to award costs would presumably be limited in this case. ***Pyburn*** did observe, however, that the AAA commercial rules "permit[] deferral or reduction of administrative costs in the event of extreme hardship." 63 S.W.3d at 363 n.5. The current version of the AAA commercial arbitration rules contains the same provision, and provides plaintiff a similar avenue for possible financial relief.

In ***Rosenberg***, this Court, again addressing a claim of prohibitively expensive arbitration costs, cited with approval and quoted an Eighth Circuit federal Court of Appeals decision in discussing the standard of proof required to establish such a claim:

> A fee-splitting arrangement may be unconscionable if information specific to the circumstances indicates that fees are cost-prohibitive and preclude the vindication of statutory rights in an arbitral forum. *See **Green Tree***, 531 U.S. at 90, 121 S.Ct. 513, 148 L.Ed.2d 373; ***Dobbins***, 198 F.3d [715,] at 717 [8th Cir. 1999]. The burden of showing that arbitrators' fees will be cost-prohibitive falls on the party seeking to avoid arbitration. ***Green Tree***, 531 U.S. at 92, 121 S.Ct. 513, 148 L.Ed.2d 373. The Supreme Court has not established what quantum of proof is necessary to meet that burden. ***Id.*** We require more than just a hypothetical inability to pay, however, to overcome the federal policy favoring arbitration. *See **Dobbins***, 198 F.3d at 716-17. The party seeking to avoid arbitration should present specific evidence of likely arbitrators' fees and its financial ability to pay those fees so that the court can determine whether the arbitral forum is accessible to the party. If the party does not meet its burden, the district court must honor the arbitration agreement and compel arbitration.

219 S.W.3d at 910 (quoting ***Faber v Menard, Inc.***, 367 F.3d 1048, 1053-54 (8th Cir. 2004)).

In ***Hill***, the Middle Section diverged somewhat from its earlier ***Pyburn*** opinion, stating, in pertinent part, as follows:

> [W]e do not consider as binding, as the final statement of Tennessee law on the question, or as determinative to the case before us, some of the ***Pyburn*** conclusions regarding costs in arbitration provisions. We do not disagree that the party seeking to invalidate an arbitration agreement on the ground that the costs are too great has the burden of proving such costs. ***Pyburn***, 63 S.W.3d at 363. We also do not disagree that the costs of arbitration should be compared to the costs of litigation, ***Id.***, because an enforceable agreement to arbitrate substitutes that forum for the judicial forum otherwise available to a claimant. However, we disagree that a provision that allows costs to be shifted to the drafter of the arbitration agreement if that party loses in the arbitration makes the agreement enforceable. ***Id.***
>
> Instead, we believe that up-front costs should be considered because the arbitration agreement may unreasonably favor the drafter of the agreement since such high up-front costs will deter the pursuit of claims. This is particularly true when the up-front costs of arbitration are disproportionately high compared to the initial costs of instituting litigation. In such cases, the drafter of the agreement stands to avoid litigation, because the other party has agreed not to pursue it, and to avoid arbitration, because the costs are so high as to prohibit many claimants from pursuing a remedy in that forum. Thus, we conclude that an agreement to arbitrate that places excessive costs on the claimant as a precondition to arbitration may be unconscionable because of the inequality of the bargain, the oppressiveness of the terms, or the one-sided advantage to the drafter. Consequently, the costs to initiate or pursue arbitration . . . in the case before us is a factor to be considered in determining whether the agreement to arbitrate is enforceable.

2008 WL 1901198 at *15-16. The ***Hill*** Court concluded:

> We do not disagree that a party who was fully informed of the potential costs, having weighed all the risks and benefits, may agree to arbitrate disputes, as many businesses have done. However, in the situation where the arbitration agreement is a contract of adhesion and there is no proof that the claimant had any information upon which to make a fully informed choice, or that any other meaningful choice was available, benefit to the drafter calls into question the enforcement of the agreement.

*Id.* at *16.

In the present case, looking at the totality of the pertinent circumstances, we conclude that plaintiff has not met his burden of showing that the costs of arbitration will be prohibitive. The *only* information plaintiff presented regarding his finances is the following two sentences in his sworn declaration:

> Since my termination, I have tried hard to obtain an equivalent position, but in the present labor market, my efforts have been unavailing.

> I have established a private engineering practice in which my annual income is about twenty-five thousand dollars ($25,000.00). I have been forced to dip into my retirement savings to make ends meet.

Plaintiff reaped significant financial benefits from the employment agreement, a part of which he now challenges. He received a buyout payment of $1,578,599 for his equity interest in his employer's businesses. He enjoyed continuing employment at a salary of $154,472 per year plus significant benefits such as a company car and health insurance coverage. He also received a $50,000 severance payment at the end of his employment as per the agreement.

Moreover, plaintiff has no legitimate argument that he was surprised by the cost of arbitration. As already noted, plaintiff, a well-educated, high-level managerial employee, had the opportunity to negotiate the agreement and plenty of time to read and consider the draft agreement with the benefit of legal counsel. Plaintiff had easy access to the AAA commercial arbitration rules and the applicable fee schedule – the appellate briefs of both parties observe that this information is available online at www.adr.org. *See Robert J. Denley Co. v. Neal Smith Constr. Co.*, No. W2006-00629-COA-R3-CV, 2007 WL 1153121 at *5 (Tenn. Ct. App. W.S., filed Apr. 19, 2007) ("To permit a party, when sued on a written

contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.") (quoting **Giles v. Allstate Ins. Co., Inc**., 871 S.W.2d 154, 157 (Tenn. Ct. App. 1993)).

Furthermore, looking at the substance of this employment agreement, there is nothing suggesting that the "inequality of the bargain is so manifest as to shock the judgment of a person of common sense," or that "the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." **Taylor**,142 S.W.3d at 285. The agreement is neither manifestly one-sided nor unfair.

To be frank, however, an agreement that has the effect of imposing a $10,000 to $30,000 price tag on having legal claims heard and decided is, in the abstract, concerning to us. *See* **Hill**, 2008 WL 1901198 at *16 ("The proof shows that the likely costs to simply initiate an arbitration under the agreement are very high, perhaps reaching $18,000. We, like the trial court, find this troubling."). But in this case, plaintiff has not shown that the arbitration costs, imposed by an agreement he freely bargained for, are prohibitively expensive *to him*. His sworn statement does not include an assertion that he is unable to pay the arbitration expenses, nor even that they would work a significant financial hardship on him. Moreover, the arbitration costs should be considered within the larger factual context that plaintiff is asserting claims for damages in the range of two to six million dollars. *See* **Rosenberg**, 219 S.W.3d at 911 ("If in fact their complaint sought to redress small claims [which] aggregated $4,000 over a period of two years, it would be easy enough to say on very limited proof that arbitration was cost prohibitive. . . .What might be prohibitive when a $4,000 claim is in issue would certainly not be prohibitive when millions of dollars and vast injunctive relief are actually in issue. . . [I]t is apparent that the costs of resolving such a controversy will be extensive and expensive regardless of whether the forum is arbitral or judicial."). In summary, considering the totality of all the relevant circumstances established in the record, we agree with the trial court's determination that the arbitration clause in this employment agreement is not unconscionable, because plaintiff did not meet his burden of establishing that the arbitration fees are cost-prohibitive and would effectively preclude the vindication of his rights as provided by statute and common law. The agreement is consequently enforceable as written.

Finally, plaintiff argues that the arbitration clause was void as against public policy. His only reason supporting this argument is his assertion that his statutory rights and claims have been thwarted because of the imposition of unconscionably and the prohibitively high cost of arbitration. We have already analyzed the merits of this argument at length above. We addressed a similar "public policy" argument in **Vintage Health Resources, Inc. v. Guiangan**, 309 S.W.3d 448, 464-65 (Tenn. Ct. App. 2009), stating:

The determination of whether a contract is against public policy is a question of law. Generally, parties are free to contract as they wish; courts should carry out the terms bargained for in the contract unless those terms violate public policy. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 100 (Tenn. 1999) (citations omitted). A contract will not be deemed to violate public policy unless it tends to harm the public good or conflict with Tennessee's constitution, laws or judicial decisions. *Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 530 (Tenn. 1991).

To determine whether a contract is void as violative of public policy, we consider "the situation of the parties at the time the contract was made and the purpose of the contract." *Hoyt v. Hoyt*, 213 Tenn. 117, 372 S.W.2d 300, 303 (1963) (citations omitted). Courts will decline to enforce a contract on the ground of public policy only when the impropriety is clear and inherent in the contract, "not merely collateral." "The principal that contracts in contravention of public policy are not enforceable should be applied with caution." *Home Beneficial Ass'n v. White*, 180 Tenn. 585, 177 S.W.2d 545, 546 (1944) (*quoting* *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356, 357, 51 S.Ct. 476, 75 L.Ed. 1112 (1931)). This is particularly true where one who . . . "has had the benefit of performance by the other party will be permitted to avoid his own promise."

(Some internal citations omitted.) Applying these general principles and our unconscionability analysis articulated above, we hold that the employment contract in this case does not violate public policy.

V.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, Darrell Trigg. The case is remanded to the trial court for enforcement of its order compelling arbitration under the employment agreement.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE